# Illinois Official Reports

## Appellate Court

---

### *People v. Jackson*, 2019 IL App (1st) 161745

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS JACKSON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-1745 |
| Filed | March 19, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-3456; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Caroline E. Bourland, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Matthew Connors, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Marcus Jackson was found guilty of possession of a controlled substance with intent to deliver between 400 and 900 grams of heroin (720 ILCS 570/401(a)(1)(C) (West 2012)). The trial court sentenced defendant to 12 years in prison. On appeal, defendant challenges the sufficiency of the evidence, contending that the State failed to prove he constructively possessed the heroin at issue. In the alternative, defendant contends that this court should grant him a new trial because during *voir dire*, the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Finally, defendant contends that if this court affirms, the mittimus should be corrected to reflect the proper name of the offense of which he was convicted. For the reasons that follow, we affirm and order correction of the mittimus.

¶ 2                                    BACKGROUND

¶ 3    Defendant's conviction arose from the events of October 14, 2013. Around 1 p.m. on that date, a group of about 12 Chicago police officers and Federal Bureau of Investigation (FBI) agents simultaneously executed two search warrants that named defendant and identified the basement and first-floor apartments of a two-flat building owned by defendant and located at 6802 South Bishop Street. During the search of the building, heroin was found in a hidden compartment in a closet door frame in the first-floor apartment. Following his arrest, defendant was charged with two counts of possession of a controlled substance with intent to deliver and eight counts of aggravated battery of a peace officer. The State proceeded to trial on one count of possession of a controlled substance with intent to deliver (between 400 and 900 grams of heroin) and four counts of aggravated battery of a peace officer. Six officers and one FBI agent testified for the State.

¶ 4    Chicago police Sergeant Michael Karczewski testified that his role in executing the search warrants was to be a perimeter officer, which meant he would watch the outside of the building for people leaving or items being thrown out. While other officers were inside the building, executing the warrants, Karczewski saw defendant come out of a side entrance to the basement and start walking. Karczewski made eye contact with defendant, announced his office, and told defendant to stop. Defendant "made an immediate about face" and started to run back to the basement door. Karczewski radioed his fellow officers that defendant was running into the basement apartment. Another officer and an FBI agent forced the basement door open and pursued defendant.

¶ 5    Eventually, Karczewski entered the basement, where defendant was handcuffed, and then accompanied defendant, the other officer, and the FBI agent to the first floor. Defendant, who was agitated and belligerent, was placed in a chair. When Karczewski approached him to inform him of the search warrants, defendant got up and ran toward the back door. Two officers did an emergency takedown and returned defendant to the chair. Because defendant continued to be loud and agitated, Karczewski called for a transport vehicle so he could be secured off-scene. As officers attempted to get defendant up from the chair, defendant head-butted one and kicked another. The officers conducted another emergency takedown and eventually brought defendant to the vehicle, despite defendant's continued flailing and kicking.

¶ 6        Defendant was taken to the police station and then a hospital. That evening, Karczewski went to the hospital, where he gave defendant *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant then told Karczewski and an FBI agent that he was the owner of the building, that he had all the utilities in his name, and that the basement was his recording studio. Defendant also said that he was sorry for the physical incidents with the officers, that he "just lost it," and that he had flushed about an ounce of cannabis down the toilet.

¶ 7        On cross-examination, Karczewski confirmed that there were six other civilians in the building at the time the warrants were executed: four on the second floor and two on the first floor. A contact card for one of the men who was located on the second floor indicated that he lived in the first-floor apartment. Karczewski acknowledged that he did not call to have the area around the hidden compartment examined for fingerprints.

¶ 8        FBI Special Agent Dennaris Coleman testified that after he entered the building on the first floor, he was informed that a suspect was trying to "run back into the building." In response, Coleman went outside and around to an exterior door to the basement, which he saw slam shut. Coleman and a police officer forced entry. Inside the basement, Coleman saw defendant coming out of a bathroom. Coleman instructed defendant to stop and put his hands above his head, but defendant ran. Coleman and the police officer caught defendant and used a takedown maneuver to put him on the ground and handcuff him. During this time, defendant was flailing, kicking, and fighting, striking both Coleman and the police officer with his hands and feet. Another FBI agent commented that he thought defendant had flushed drugs, at which point defendant said, "Yes, I just flushed a little bit of weed." Officers took defendant upstairs.

¶ 9        Coleman cleared the basement apartment to make sure no other people were present. He then went up to the first-floor apartment, where he saw officers trying to control defendant, who was flailing and kicking. Officers put defendant in a chair, but he stood up and attempted to move, so they put defendant on the ground. When a transport vehicle arrived, Coleman assisted in escorting defendant to it. Coleman attempted to frisk defendant for weapons, but defendant head-butted him and kicked Coleman's legs, so Coleman and the other officers conducted another takedown.

¶ 10        Chicago police officer Scott Bittner testified that when he arrived at the scene, he was informed that a suspect had opened up a basement door and then run back inside. Bittner entered the basement, where he saw defendant being detained by a Chicago police officer and an FBI agent. Defendant was yelling, squirming, and flailing his body. Officers took him to the first floor and put him in a chair. Defendant continued to yell and scream, got up, and was "taken down" forcefully by officers. Eventually, defendant was brought outside to a transport vehicle.

¶ 11        Thereafter, Bittner joined other officers in searching the basement and first-floor apartments. On the first floor, he recovered two pieces of unopened mail from a built-in hutch in the living room. One, from ComEd, was addressed to defendant at "6802 S Bishop St," and the other, from the City of Chicago Department of Water Management, was addressed to defendant "or current resident" at "6802 S Bishop St." Bittner did not recall finding any other mail with anyone else's name on it on the first floor.

¶ 12        Chicago police officer Vincent Ciocci testified that when he entered the building on the first floor, defendant was in handcuffs being led upstairs from the basement. Defendant was kicking and screaming at the officers who were holding him as they were coming up the stairs from the basement to the first floor. At one point, defendant was placed in a chair, but he got up

and tried to run. An officer grabbed him and eventually defendant was taken to a transport car because he was belligerent.

¶ 13    Once defendant was under control, Ciocci and some other officers went to the basement apartment. There, the officers found two digital scales, one of which had a white powdery residue on it; a Magic Bullet mixer, which Ciocci explained could be used to mix heroin with cutting agents such as Dormin or Sleepinal; two small bags of cannabis; a large amount of cash in a bag; and an envelope from the City of Chicago Department of Revenue addressed to defendant at "6802 S Bishop St." The items Ciocci observed in the basement were recovered and inventoried.

¶ 14    Chicago police officer Sean Brandon testified that, when he entered the building, he immediately went to the second-floor apartment. There, he came upon four people. Once Brandon received word that the first floor and basement were secure, he brought the four people from the second floor to the first floor. Eventually, he assisted in the search of the first-floor apartment. Brandon testified that during the search of the first floor, officers found two "proofs of residency," a hidden compartment that contained suspect heroin, and a City of Chicago permit in a window. The permit was for plumbing work at "6802 S Bishop St" and listed defendant as the property owner and emergency contact.

¶ 15    Chicago police officer Robert Gallas testified that, when he entered the building, he immediately went to the second floor, where he and another officer detained four people. When Gallas went down to the first floor, he saw a number of officers and two other civilians. At some point, two officers brought defendant up from the basement. Defendant, who was moving around and being verbally abusive, was placed in a chair. When a sergeant showed defendant copies of the search warrants for the building, defendant got up out of the chair and attempted to run out the back of the apartment. He ran about 10 to 15 feet before Gallas and another officer used an emergency takedown tactic on him. Defendant continued to flail and kicked the other officer in his legs. Once the officers had control of defendant, he was placed back in the chair, where he remained until a transport vehicle arrived. Then, on the way out of the building to the vehicle, defendant resumed flailing his upper body and kicking his legs and head-butted Gallas. In response, Gallas and other officers took defendant down again. When Gallas and other officers got defendant outside, an officer attempted to frisk defendant. Defendant began fighting the officers again and kicked one of them in the leg. Eventually defendant was placed in the vehicle.

¶ 16    After defendant was in the vehicle, Gallas went into the basement apartment. In court, he identified photographs of the basement's kitchen area. One of the photographs depicted empty packaging and capsules of Sleepinal and Dormin in the sink. Gallas stated that the contents of Sleepinal and Dormin capsules could be mixed with heroin. Another photograph showed a Magic Bullet blender that was recovered from the top of the refrigerator. Gallas explained that such blenders were used to mix brick heroin with cutting agents, such as Dormin, and to reduce such mixtures to powder form. Gallas also explained that digital scales, like the one recovered from the basement kitchen, were important in the sale of narcotics, as most narcotics are sold on the street in grams or ounces.

¶ 17    Chicago police Sergeant John Hamilton, a specialist in the location, identification, and operation of hidden compartments, testified that on the day in question, he received a call to assist in locating or operating a possible hidden "trap" in the building in question. When he arrived at the scene, he did a cursory search of the entire residence, looking for modifications

to the structure of the building. During that search, he noticed an anomaly in the frame of a doorless closet in a first-floor bedroom. Specifically, the wood was cut at a non-standard angle that allowed it to move, and a trim nail had "backed itself out," chipping the wood, which he explained does not happen without movement such as opening and closing. Based on these observations, Hamilton believed there was a compartment in that wall area.

¶ 18    Hamilton went around to the opposite side of the wall and had other officers pull back a wall panel, exposing a motorcycle battery, battery charger, and wiring that operated the hidden compartment. Hamilton also observed wired screws sticking out of the floor, which he described as "the switching system." With regard to the screws, Hamilton stated, "Had I not seen it from underneath, it would have been almost impossible to find because they were just screws screwed into the carpet, so you would have had to literally spread the fibers." When Hamilton touched a piece of wire to the screws, a panel of the closet door frame opened and closed, powered by a small electric motor from an automatic car window. When the panel of the door frame was open, it exposed a compartment inside the wall. In the compartment Hamilton observed two blocks of suspect heroin.

¶ 19    On cross-examination, Hamilton agreed that he had been called the Chicago Police Department's "foremost expert" in hidden traps. He also agreed that, had he not seen the chip in the wood of the door frame, the compartment would have been very difficult to find.

¶ 20    The parties stipulated that the contents of the two items recovered from the hidden compartment tested positive for heroin. One weighed 594.0 grams, and the other weighed 10.7 grams. The parties further stipulated that the two bags recovered from the basement tested positive for cannabis, with the contents of one bag weighing 3.4 grams and the other weighing 0.7 grams. Finally, the parties stipulated that the residue found on the digital scale in the basement tested positive for the presence of both heroin and cocaine.

¶ 21    Defendant's motion for a directed verdict was denied.

¶ 22    During deliberations, the jury sent out a question, asking whether two photographs entered into evidence depicted the basement or the first floor. With the parties' agreement, the trial court answered, "It is for you to determine the facts of the case. Please continue to deliberate." The photographs in question both depicted the basement kitchen.

¶ 23    The jury thereafter found defendant guilty of possession of a controlled substance with intent to deliver and not guilty on all four counts of aggravated battery of a peace officer. Defendant filed a motion for a new trial alleging, among other things, that he had no knowledge of or control over the drugs recovered in the first-floor apartment. Following a hearing, the trial court denied the motion. The court subsequently sentenced defendant to 12 years in prison.

¶ 24                                    ANALYSIS

¶ 25    Defendant first challenges the sufficiency of the evidence, contending that the State failed to prove he constructively possessed the heroin recovered from the first-floor apartment.

¶ 26    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). Reversal is justified where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the

defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). In this case, to prove defendant guilty of possession of a controlled substance with intent to deliver, the State was required to show that he unlawfully and knowingly possessed with the intent to deliver between 400 and 900 grams of heroin. 720 ILCS 570/401(a)(1)(C) (West 2012).

¶ 27 Possession may be actual or constructive and is often proved with circumstantial evidence. *People v. Love*, 404 Ill. App. 3d 784, 788 (2010). Constructive possession—which is at issue in the instant case—exists where a defendant has the intent and capability to maintain control and dominion over the contraband, and it may be proved with evidence that the defendant had knowledge of the presence of the contraband and had immediate and exclusive control over the area where the contraband was found. *Id.* Knowledge may be inferred from surrounding circumstances, such as the defendant's actions, declarations, or other conduct, which indicate that the defendant knew the contraband existed in the place where it was found. *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002); *People v. Smith*, 288 Ill. App. 3d 820, 824 (1997). Control is established when the defendant has the capability and intent to maintain dominion and control over the contraband. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Proof that a defendant had control over the premises where the contraband is found gives rise to an inference of knowledge and possession of that contraband (*People v. Givens*, 237 Ill. 2d 311, 335 (2010)), and a defendant's proved habitation in the premises where contraband is found is sufficient evidence of control of the location to establish constructive possession (*Spencer*, 2012 IL App (1st) 102094, ¶ 17). Constructive possession is not diminished by evidence of others' access to contraband. *Givens*, 237 Ill. 2d at 338.

¶ 28 Defendant argues that the evidence at trial was insufficient to prove constructive possession of the heroin. He stresses that the heroin was hidden in a secret compartment that the State's "foremost" expert said was "almost impossible" to find and that there was no evidence he had access to it. He acknowledges that he had a connection to the building, as he owned it, all the utilities were in his name, and he was present in the basement apartment at the time the search warrants were executed. However, he asserts that the State did not prove he lived in the first-floor apartment or had been present in it either on the date of the search or any recent time prior to the search. He highlights that two other people were occupying the first-floor apartment at the time of the search and that the contact card for a person who was on the second floor at that time indicated the first-floor apartment was his residence. He also notes that the mail recovered from the first-floor apartment did not list any specific floor or apartment and had not been opened. Defendant argues that, where many different people had access to the first-floor apartment but no evidence was presented to show when he himself last entered that apartment, no rational trier of fact could have concluded he had constructive possession of the heroin found there.

¶ 29 We disagree with defendant and find that, when viewed in the light most favorable to the prosecution, the evidence presented at trial was sufficient to demonstrate his constructive possession of the heroin. That is, the circumstantial evidence was sufficient to establish that defendant had knowledge of the heroin and control over the area where it was found.

¶ 30 Most notably, there is no dispute that defendant owned the building, that all the utilities were in his name, that two utility bills addressed to him were recovered in the first-floor apartment, and that a work permit posted in a first-floor window listed him as the property owner and emergency contact. These circumstances suggest that defendant did have access to the first-floor unit. No evidence, other than a contact card that was not admitted into evidence,

was introduced to show that anyone else in the building leased the first floor, so as to suggest that his or her control of the apartment was to the exclusion of defendant. Moreover, at the time the search warrants were executed, defendant was present in the building, in a basement apartment that appears, based on the testimony regarding his struggles with the police while being brought upstairs, to have had indoor access to the first-floor apartment. In that basement apartment, the police found drug paraphernalia, including a scale with heroin residue on it, that indicates defendant was involved in selling heroin. We acknowledge that the compartment from which the heroin was recovered was hidden, a factor that has been found to undercut an inference of knowledge. See *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 30. But, given the complexity of the machinery that operated the trap, the effort involved in building the compartment would have been difficult to hide. Finally, defendant's attempt to flee indicates consciousness of guilt. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 53. While defendant suggests that his flight attempts may have simply demonstrated consciousness of guilt of possession of the cannabis and drug paraphernalia in the basement, the violent and repeated nature of his attempts to escape from the police are manifestly disproportionate to his admission to flushing "a little bit of weed" down the toilet and suggest consciousness of a greater crime.

¶ 31    The cases defendant relies upon, *Terrell*, 2017 IL App (1st) 142726, *People v. Fernandez*, 2016 IL App (1st) 141667, and *People v. Maldonado*, 2015 IL App (1st) 131874, do not change our decision.

¶ 32    In *Terrell*, the defendant was convicted of possession of a controlled substance after police who were executing a search warrant at an apartment found drugs, drug paraphernalia, and weapons in a hidden compartment in a hallway closet. *Terrell*, 2017 IL App (1st) 142726, ¶¶ 1, 4, 8, 9. In the apartment's living room, the police found two prescription bottles and an adult probation card bearing the defendant's name, the defendant's passport, and a framed photograph that included the defendant. *Id.* ¶¶ 5, 7. In the dining room, police found a duffel bag containing large men's clothing. *Id.* ¶ 6. During the search, an FBI agent spotted defendant in a truck parked in front of the apartment. *Id.* ¶ 10. Later, the police discovered a hidden compartment in the truck that resembled the one found inside the apartment. *Id.* ¶ 11.

¶ 33    On appeal, this court concluded that the State had not established constructive possession and reversed. *Id.* ¶ 31. We explained that the trial court had not been "presented with a plethora of evidence tying [the defendant] to either the Apartment or to the hidden contraband." *Id.* ¶ 21. Among other things, we noted that the apartment's lessee was present in the apartment at the time of the search, none of the addresses listed on any of the evidence matched the apartment's address, and none of the defendant's property was found in the same room as the contraband. *Id.* ¶¶ 21, 22, 25. We further noted that the defendant's mere presence in the vicinity was insufficient to establish constructive possession. *Id.* ¶ 26. Finally, we reasoned that even if it were assumed, *arguendo*, that the defendant had "some connection" with the apartment, the fact that the contraband was concealed in a hidden compartment in a closet undercut the inference that he had knowledge of its existence, and the State's failure to prove the defendant had ever entered the apartment created a reasonable doubt with regard to knowledge. *Id.* ¶¶ 30, 31.

¶ 34    Here, unlike *Terrell*, defendant owned the building where the heroin was found. In addition, both pieces of mail and the work permit found in the first-floor apartment had defendant's name and the address of the building on it, and no evidence was found listing a

different address for defendant. Third, defendant was not in the mere vicinity of the apartment when the warrants were executed but, rather, inside the building in a basement apartment that connected with the first-floor apartment. For all these reasons, *Terrell* is distinguishable from the instant case.

¶ 35    In *Fernandez*, the police arrested the defendant after he fled and then recovered heroin from his person and from within his car. *Fernandez*, 2016 IL App (1st) 141667, ¶¶ 7, 8. The police also recovered a set of keys from the defendant and subsequently executed a search warrant of the single family home and detached garage. *Id.* ¶¶ 3, 9, 10. Though they forced entry to both the house and garage, police later learned the keys recovered from defendant unlocked both. *Id.* ¶ 12. When the officers entered the house, they encountered a man who said he lived in a downstairs bedroom. *Id.* ¶ 10. In a different bedroom, officers found a gun beneath a mattress, a passport and insurance cards belonging to the defendant but not listing an address, and framed pictures of the defendant with the woman with whom he was driving on the day of his arrest. *Id.* ¶ 11. A closet held both men's and women's clothes, and additional framed pictures of the defendant with the same woman were hanging in the living room. *Id.* Underneath the hood of a van in the garage, officers found three guns, ammunition, a brick of heroin, and bags of heroin. *Id.* ¶ 12. The arrest report reflected a different address for the defendant, and the parties stipulated that the defendant's father would have testified that he tendered defense counsel with several items of mail addressed to the defendant at the alternate address. *Id.* ¶¶ 13, 14. Prior to trial, the defendant moved for a *Franks* hearing (see *Franks v. Delaware*, 438 U.S. 154 (1978)), supporting the motion with affidavits from family members averring that the defendant did not live at the house but, rather, his aunt and cousin did. *Fernandez*, 2016 IL App (1st) 141667, ¶ 5. The defendant was convicted of possession of heroin with intent to deliver and multiple counts of unlawful possession of a weapon by a felon. *Id.* ¶ 1.

¶ 36    This court found that the State had failed to prove constructive possession of any of the contraband and reversed the defendant's convictions. *Id.* We determined that the defendant's possession of keys to the house and garage and the presence of his personal effects in the house did not demonstrate control over the premises. *Id.* ¶¶ 20-21. We explained that this court has never upheld a conviction for possession based solely on a defendant's possession of keys and that, moreover, the presence of an unidentified man on the premises at the time the police executed the search warrant weighed against a finding that the defendant maintained control over the premises. *Id.* ¶ 21. We reasoned that, even assuming that the defendant had "some connection" with the residence, no evidence placed him in the residence on the date the search warrant was executed or on any other date. *Id.* ¶ 22. Further, we explained that the fact that the weapon was concealed under a mattress undercut the inference that the defendant had knowledge of the gun. *Id.* We concluded that, in light of the hidden location of the gun and the State's failure to prove that the defendant ever entered the home, there was a reasonable doubt as to the defendant's knowledge of the presence of the gun. *Id.* Finally, we found that the evidence connecting the defendant to the garage was more tenuous than that connecting him to the bedroom, stating that, even assuming the defendant had access to the garage, nothing suggested he had knowledge of the presence of the hidden contraband underneath the hood of the van. *Id.* ¶¶ 23, 24.

¶ 37    In contrast to *Fernandez*, here, defendant admitted that he owned the building where the heroin was found. Moreover, no evidence listed a different address for defendant. Rather, two

utility bills and a work permit recovered from the first-floor apartment were addressed to defendant at the building. Additionally, defendant was present in the building at the time the police executed the search warrants. For all these reasons, *Fernandez* is distinguishable.

¶ 38  Finally, in *Maldonado*, police executing a search warrant of a single family house found heroin hidden inside a statue, several boxes of ammunition, and a box containing a scale and $1500 cash. *Maldonado*, 2015 IL App (1st) 131874, ¶ 3. The police also found an unopened, mass marketing mailer addressed to the defendant at the house's address; an unopened envelope from "ABC Bank" addressed to the defendant at the house's address, which may have been official business or may have been a junk mail solicitation; and a delivery receipt showing the defendant's name as the purchaser, the house's address as the purchaser's address, and the defendant's wife's signature in the area marked "received." *Id.* ¶¶ 7, 28. The defendant was convicted of unlawful use of a weapon by a felon and possession of a controlled substance with intent to deliver. *Id.* ¶ 1.

¶ 39  This court reversed, concluding that the State had failed to establish constructive possession with respect to the heroin and the ammunition. *Id.* ¶ 24. We found that the State did not present any direct evidence establishing the defendant's control over the premises and that, even if the two mailings and one delivery receipt were sufficient to draw an inference that the defendant controlled the premises, the State did not present any evidence that the defendant had knowledge of the contraband found in the house. *Id.* Acknowledging that mail addressed to a defendant found where contraband is recovered may be sufficient to allow an inference of residency, we stated we would not draw the same inference where the defendant was not present during the execution of the search warrant and other indicia of residency were not shown. *Id.* ¶ 29. We noted that the defendant never admitted his residency and that there was no testimony that the defendant was ever seen inside the location and explained that the delivery receipt and unopened mail were "of minimal inferential value at best" and insufficient to establish proof of control beyond a reasonable doubt. *Id.* ¶¶ 34, 37. With regard to knowledge, we held that no reasonable inference flowed from the evidence that the defendant at any time would have known either the contents of an enclosed statue or the contents of the boxes where ammunition was found. *Id.* ¶¶ 41, 42.

¶ 40  Unlike *Maldonado*, in the instant case, defendant acknowledged that he owned the building. He was also present in the basement apartment of the building, which connected to the first-floor apartment, at the time the search warrants were executed. Finally, the mail found in the first-floor apartment was not junk mail but, rather, utility bills. Thus, *Maldonado* is distinguishable from the facts here.

¶ 41  In sum, we find that the evidence presented at trial, when viewed in the light most favorable to the prosecution, was sufficient to demonstrate that defendant had constructive possession of the heroin.

¶ 42  Defendant next contends that this court should grant him a new trial because during *voir dire*, the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant acknowledges that he failed to preserve this issue by objecting and including it in a posttrial motion but asserts that we may nevertheless reach it as first-prong plain error. The State concedes that the trial court erred but maintains that plain error review is unavailable because the evidence at trial was not closely balanced.

¶ 43  Rule 431(b), which codifies the principles set out in *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984), requires the trial court to ask each potential juror if he or she understands and accepts

four principles: (1) the defendant is presumed innocent of the charge(s) against him; (2) before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to offer any evidence on his or her own behalf; and (4) if a defendant does not testify, it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Even though Rule 431(b) does not contain a "precise formula for trial judges to use in ascertaining jurors' prejudices or attitudes" (*People v. Emerson*, 122 Ill. 2d 411, 426-27 (1987)), the rule requires trial courts to address each enumerated principle and "mandates a specific question and response process" (*People v. Thompson*, 238 Ill. 2d 598, 607 (2010)). The court is required to ask each juror if he or she understands and accepts each of the principles set out in the rule. *Id.*

¶ 44      Here, the trial court addressed the venire as a whole, explaining that the defendant is presumed innocent, that the State has to prove his guilt beyond a reasonable doubt, and that he does not have to present any evidence or testify on his own behalf. After explaining each principle, the court asked the potential jurors to raise their hands if they had "problem" or "disagreement" with the proposition. No one raised a hand.

¶ 45      Asking potential jurors whether they have a "problem" with the *Zehr* principles, rather than whether they understand and accept them, is clear error. *People v. Sebby*, 2017 IL 119445, ¶ 49; *People v. Wilmington*, 2013 IL 112938, ¶ 32; see also *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 31 (asking whether prospective jurors "disagree with" the *Zehr* principles is clear error). As such, we agree with the parties that the trial court committed clear error in the instant case.

¶ 46      The question then becomes whether the trial court's error constitutes plain error. Under the plain error doctrine, a reviewing court may, in its discretion, excuse a party's procedural default if a clear or obvious error has occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Staake*, 2017 IL 121755, ¶ 31. Invoking the first prong, defendant argues that the evidence in this case was closely balanced, since it "could hardly be said that reasonable jurors could only draw a conclusion of guilt from this evidence." Defendant also notes that the jurors sent out a question regarding the photographic exhibits, which he asserts suggests they did not find an automatic connection between him and the heroin and highlights that they acquitted him of the charges of aggravated battery of a peace officer.

¶ 47      A "closely balanced" case is "one where the outcome of the case would have to be different had the impropriety not occurred." *People v. Pierce*, 262 Ill. App. 3d 859, 865 (1992). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. This inquiry must involve assessing the evidence on the elements of the charged offense or offenses, along with any evidence regarding the credibility of the witnesses. *Id.* Considering whether evidence is closely balanced does not involve the sufficiency of close evidence but, rather, the closeness of sufficient evidence. *Id.* ¶ 60. If the defendant carries the burden of showing the evidence is closely balanced, the error is actually prejudicial. *Id.* ¶ 51.

¶ 48    Evidence has been found to be closely balanced where each side has presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account. See, *e.g.*, *id.* ¶ 63; *People v. Naylor*, 229 Ill. 2d 584, 608 (2008). No "credibility contest" exists when one party's version of events is unrefuted, implausible, or corroborated by other evidence. *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 31. Moreover, a fact-finder's need to assess the credibility of a witness where no rival witnesses or other competing evidence was presented does not render the evidence closely balanced. *People v. Hammonds*, 409 Ill. App. 3d 838, 861-62 (2011).

¶ 49    Here, there was no credibility contest between opposing parties. The police officers' and FBI agent's overall descriptions of the events surrounding the search of the building were consistent with each other and were corroborated by the recovered evidence and photographs of the scene. No evidence was presented to challenge the witnesses' honesty. While the case against defendant may not have been airtight, evidence need not be perfect to avoid application of the plain error doctrine. *Montgomery*, 2018 IL App (2d) 160541, ¶ 32. Applying a commonsense approach based on the context of the case, we find that where the State's evidence was strong and unrefuted, the evidence was not closely balanced. As such, defendant cannot obtain relief under the plain error doctrine.

¶ 50    Last, defendant contends that the mittimus should be corrected to reflect that he was convicted of possession with intent to deliver between 400 to 900 grams of heroin, rather than manufacture or delivery of between 400 to 900 grams of heroin.

¶ 51    The mittimus correctly indicates that defendant was convicted of violating section 401(a)(1)(C) of the Illinois Controlled Substances Act, which provides that "it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance *** 400 grams or more but less than 900 grams of a substance containing heroin, or an analog thereof." 720 ILCS 570/401(a)(1)(C) (West 2012). However, the mittimus describes defendant's offense as "MFG/DEL 400<900 GR HERO/ANLG," which is not entirely accurate since, as defendant observes, his crime was possessing heroin with the intent to deliver, not manufacturing or delivering heroin. The State agrees with defendant that the mittimus should be changed.

¶ 52    We agree with the parties. In our view, it would be preferable for the mittimus to reflect the name of the offense as it was set forth on the charging instrument, *i.e.*, "possession of controlled substance with intent to deliver." As such, pursuant to our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967), we direct the clerk of the circuit court to amend the mittimus to reflect more accurately the name of defendant's conviction. See *People v. Blakney*, 375 Ill. App. 3d 554, 560 (2007) (appellate court may, without remand, correct the mittimus to accurately reflect the name of the offense for which a defendant has been convicted, even where the statutory citation is correct).

¶ 53                                    CONCLUSION

¶ 54    For the reasons set forth above, we affirm the judgment of the circuit court and order correction of the mittimus.

¶ 55    Affirmed; mittimus corrected.