2026 IL App (1st) 241878-U

No. 1-24-1878

Order filed May 14, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 MC4 002831 |
| | ) | |
| JOCELYN CARABALLO, | ) | Honorable |
| | ) | Teresa Molina-Gonzalez, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Lyle and Quish concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for battery where, although error occurred during *voir dire*, defendant failed to establish that the evidence was closely balanced for plain error review.

¶ 2   Following a jury trial, defendant Jocelyn Caraballo was convicted of battery and sentenced to 24 months' conditional discharge. On appeal, she contends that the trial court committed plain error during *voir dire* by failing to ask whether the venirepersons understood and accepted the four

principles outlined in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and that the evidence at trial was closely balanced. We affirm.

¶ 3       Following an incident between defendant, her sister Joanna Caraballo (Joanna), and Kiana Mendoza on June 10, 2023, Joanna and defendant were charged by misdemeanor complaint with criminal damage to property for damaging Mendoza's necklace and iPhone (720 ILCS 5/21-1(a) (West 2022)) and battery for striking Mendoza's face and body (*id.* § 12-3(a)(1)).

¶ 4       Before trial, the trial court granted, over defendant's objection, the State's motion for joinder of defendant's and Joanna's cases and proceeded with the selection of one jury.

¶ 5       The trial court began *voir dire* with a first panel of 14 potential jurors. The court instructed the members of the venire to raise their hands to answer a question in the affirmative.

¶ 6       In relevant part, the trial court stated that the defendant was presumed innocent until a jury determined, after deliberation, that the defendant was guilty beyond a reasonable doubt. The court then asked, "Does anyone disagree with this rule of law?" Commenting that no hands were raised, the court next told the venirepersons that the State bore "the burden of proving the defendant guilty beyond a reasonable doubt." The court again inquired, "Does anyone disagree with this rule of law?" It remarked that no hands were raised and continued, explaining that the defendant was not required to present any evidence and could "rely on the presumption of innocence." The report of proceedings indicates "(no response)" was given. Without stating whether any hands were raised, the court informed the potential jurors that the defendant did not have to testify and asked whether any members of the venire would hold the defendant's refusal to testify against her. The court noted that no hands had been raised.

¶ 7    Next, the trial court questioned potential jurors individually. During the court's examination, it emerged that one member of the venire did not "understand English" completely, and another venireperson had translated for him at times. The court excused that first potential juror on its own motion.

¶ 8    The trial court also examined a second panel of 14 potential jurors and again instructed the members of the venire to raise their hands to answer "yes" to a question. Relevantly, the court then repeated virtually verbatim its statements that the defendant was innocent until determined to be guilty, the State had the burden of proving guilt beyond a reasonable doubt, and the defendant did not have to present evidence. After each statement, the court asked, "Does anyone disagree with this rule of law?" Each time, it noted that no hands were raised. The court next restated that the defendant did not have to testify and asked whether any potential jurors would hold the defendant's choice not to testify against her. The court remarked that no hands were raised.

¶ 9    The trial court empaneled 14 jurors from the 28 venirepersons it examined. No objections were made to the trial court's questioning of the potential jurors.

¶ 10    At trial, Mendoza testified that she and Joanna were neighbors and had been friends from childhood to adulthood. When Mendoza arrived at her apartment complex on June 10, 2023, she found Joanna's vehicle in Mendoza's assigned parking space. Mendoza parked behind Joanna's vehicle and went to Joanna's apartment to tell her to move her vehicle. Mendoza knocked on the door to Joanna's apartment, and Joanna opened the door "all the way." Mendoza requested that Joanna move her vehicle, or Mendoza would call the towing company. Joanna then hit Mendoza on the lip. Mendoza struck back.

¶ 11    Defendant, whom Mendoza identified in court, came "running out" of the bathroom. Defendant struck Mendoza's face, ripping her lip open, jumped on her back, and bit her arm and the back of her neck. At some point, defendant slammed Mendoza's phone on the concrete. At another point, defendant hit Mendoza with a chair. Meanwhile, Joanna kept fighting Mendoza. Mendoza "blacked out a few times," falling to her knees at one point, but she "kept standing up." Mendoza testified that she remained outside Joanna's apartment during the entire incident, which lasted two or three minutes. When the sisters stopped hitting her, Mendoza heard the sirens of approaching police vehicles.

¶ 12    During the fight, defendant and Joanna ripped off Mendoza's clothes, and so the police covered her with a towel and took pictures. Mendoza went home to treat her injuries, which took approximately two months to heal. Her "shattered" phone no longer worked, and pieces from her necklace were missing.

¶ 13    The State published several photographs of Mendoza taken after the altercation, which the court entered into evidence without objection and are in the record on appeal. This court has viewed the photographs, which depict Mendoza's bloodstained cheeks, chin, forehead, and nose. Her neck and right arm appear scratched. Bite marks are visible on Mendoza's right arm and the back of her neck. Her back appears red. Mendoza's clothing hangs open to reveal several bloodstains down the right side of her torso. The State also published photographs, which were entered into evidence without objection, of Mendoza's phone depicting a smashed screen, and of her necklace, which, according to Mendoza, lacks three medallion pieces that had previously adorned it.

¶ 14    On cross-examination, Mendoza clarified that she did not "black out" during the altercation but was "seeing black." She confirmed that the altercation "happened quickly" and added that she "was being jumped by two women, battered with fists, a chair" and "[a]ll [she] wanted was a car to be moved." Mendoza had heard about an individual named Glen Watkins but was "not familiar with him at all." (Watkins's name also appears as "Gray" in the record on appeal.)

¶ 15    On redirect examination, Mendoza added that she did not see any blood or cuts on Joanna or defendant. On recross-examination, Mendoza denied spitting blood. She refused medical attention immediately after the altercation but went to the hospital the next day.

¶ 16    Joanna testified that she parked her vehicle in Mendoza's assigned space on June 10, 2023. She used that space because Watkins, the father of defendant's child, had threatened her, and it was easier to see or hear if Watkins tampered with her vehicle from that parking space. Mendoza was aware that Joanna used her space and that Joanna had been threatened. Mendoza knew Watkins "very well."

¶ 17    On June 10, 2023, Mendoza "banged" "really loud" on Joanna's front door, and Joanna answered. Mendoza asked if Joanna could move her "f*** car" because Watkins had also threatened Mendoza. Joanna responded "politely, no, and [she] went to close the door." Mendoza then pulled her hair back in a "ponytail bun" and assumed a fighting stance. As Joanna "went to slam [her] door closed," Mendoza kicked it open, grabbed Joanna by the hair, and started hitting Joanna inside the apartment. Defendant exited the bathroom and attempted to separate Joanna, who was "trying to defend [her]self," and Mendoza, who started also hitting defendant. The sisters tried to push Mendoza out of Joanna's apartment, and Mendoza grabbed a chair outside Joanna's front door and attempted to hit defendant. The group were fighting in the doorway "for a little

minute." Mendoza "kept trying to force her way inside" Joanna's apartment, and the sisters eventually got her out of the apartment.

¶ 18    On cross-examination, Joanna added that she fought back against Mendoza. Joanna had "some lumps" on her head, but they were not visible because of her hair. Mendoza was "going to hit" defendant with a black metal chair, and defendant threw the chair out of Mendoza's hand. Joanna denied biting Mendoza. When asked whether defendant bit Mendoza, Joanna responded, "I'm not saying that." The State inquired, "Someone bite [*sic*] her?" Joanna replied, "Yes." The State queried, "But it was not you, neither your sister? Yes or no." Joanna answered, "Yes."

¶ 19    On redirect examination, Joanna clarified that defendant took the chair from Mendoza during the altercation and threw it out of reach.

¶ 20    Defendant testified that she also had been friends with Mendoza for over 20 years. Mendoza knew Watkins, explaining that Mendoza was even in the delivery room with Watkins and defendant when defendant gave birth to the couple's first child. Mendoza knew about defendant's troubles with Watkins, and defendant had asked Mendoza not to associate with him. When Mendoza continued associating with Watkins, defendant told Mendoza that their friendship was "done."

¶ 21    On June 10, 2023, defendant was in Joanna's bathroom when she heard someone banging on the front door. Defendant heard Mendoza "screaming" for Joanna to move her "f*** car" and that Watkins was also threatening her. Defendant heard Joanna say "no," the door closing, and then "a big thump."

¶ 22    Defendant exited the bathroom and saw Mendoza inside the doorway holding Joanna by the hair and hitting the back of Joanna's head. Defendant attempted to separate them and push

Mendoza out of the apartment. Mendoza leaned out the front door and grabbed a chair with the hand not holding Joanna's hair. Defendant took the chair from Mendoza and threw it out of reach but denied hitting Mendoza with the chair. Mendoza was "furious" that defendant took the chair out of her hand. While still holding on to Joanna, Mendoza used her free hand to hit defendant. Mendoza hit defendant "so hard" that defendant "had to defend [herself]." Mendoza struck defendant in the face and, at one point, grabbed defendant's "private parts." Mendoza stopped fighting with them "when she heard police sirens" and ran downstairs.

¶ 23    On cross-examination, defendant testified that Mendoza spat blood and attempted to spit it at her. Mendoza punched defendant's face, which left a mark that was not visible until the next day. The State published a photograph of defendant taken at a police station after the incident, which the court entered into evidence without objection. The photograph, included in the record on appeal, depicts defendant free of marks or blood, and her clothing appears intact.

¶ 24    Defendant testified that she grabbed the chair from Mendoza's hands while Joanna was "still being attacked." Defendant instructed Mendoza "to stop because she was the aggressor." Defendant "didn't have time to call 911 because a chair was being thrown at [her]." Defendant confirmed that Mendoza was not bleeding when defendant exited the bathroom and was bleeding when the fight ended. Defendant could not recall how hard she struck Mendoza or whether Mendoza was spitting blood because of the injuries that defendant caused her. Defendant admitted that she did not bleed during the altercation.

¶ 25    The State published a photograph of Joanna taken at the police station after the incident, which the court entered into evidence over defendant's objection and is included in the record on

appeal. The photograph shows no visible marks or blood on Joanna, and her clothing appears intact.

¶ 26    Defendant stated that she loved Joanna and agreed she would "do anything to defend her" but denied that she would bite someone, hit a person with a chair, or smash a phone for Joanna. On recross examination, defendant stated that Mendoza already had the chair when defendant left the bathroom.

¶ 27    The State argued in closing that Joanna threw the first punch and highlighted Mendoza's injuries and the sisters' lack thereof. Joanna and defendant countered in closing that they fought back in self-defense and defense of dwelling. During the State's rebuttal closing argument, the trial court twice sustained objections that the State misstated the law of self-defense and overruled an objection for misstating the evidence that Mendoza did not hit defendant or Joanna.

¶ 28    The trial court instructed the jury on the charged offenses of battery and criminal damage to property and the affirmative defenses of self-defense, defense of others, and defense of a dwelling.

¶ 29    The jury found defendant guilty of battery and not guilty of criminal damage to property. It found Joanna not guilty of both criminal damage to property and battery.

¶ 30    Defendant filed a motion and a supplemental motion for judgment notwithstanding the verdict or for a new trial, both of which the trial court denied.

¶ 31    The court sentenced defendant to 24 months' conditional discharge.

¶ 32    On appeal, defendant asserts that the trial court violated Rule 431(b) during *voir dire*, because it did not ascertain whether the potential jurors understood and accepted the Rule's four

principles. Defendant concedes that she did not preserve this issue for our review and requests plain error review.

¶ 33    A defendant forfeits an issue for this court's review unless she preserves that issue by objecting at trial and in a posttrial motion. *People v. Brown*, 2025 IL App (1st) 230772, ¶ 71. We may review an issue for plain error where "a clear or obvious error occurred," and either (1) "the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant," or (2) "the error [was] so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Chambliss*, 2026 IL 130585, ¶ 61. The defendant bears the burden of establishing plain error. *People v. Williams*, 2025 IL App (1st) 240582, ¶ 62. The first step is to determine whether clear or obvious error occurred because "absent error, there can be no plain error." *People v. Boston*, 2016 IL App (1st) 133497, ¶ 56.

¶ 34    Rule 431(b) provides that a trial court must ask "each potential juror *** whether that juror understands and accepts" the four principles set forth in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), that (1) a defendant is presumed innocent until proven guilty, (2) the State must prove a defendant guilty beyond a reasonable doubt, (3) a defendant is not required to present evidence, and (4) a defendant's decision not to testify cannot be held against her. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); *People v. Jackson*, 2022 IL 127256, ¶ 38. The trial court must ask whether the venirepersons understand and accept these four principles. *People v. Murry*, 2025 IL App (1st) 221202, ¶ 71. We review asserted Rule 431(b) violations *de novo*. *People v. Kline*, 2024 IL App (1st) 221595, ¶ 44.

¶ 35    Defendant argues, and the State concedes, that the trial court violated Rule 431(b) because it only asked the members of venire whether they agreed with *Zehr*'s four principles—it did not also ask whether they understood those principles.

¶ 36    Rule 431(b) is " 'clear and unambiguous' " that a court errs if it fails to ask whether venirepersons both understand and accept the four principles. *People v. Ticey*, 2021 IL App (1st) 181002, ¶ 45 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 45). Here, the court asked only whether the potential jurors disagreed with the four principles without ascertaining whether they understood the four principles. The court therefore erred. See *Murry*, 2025 IL App (1st) 221202, ¶ 71.

¶ 37    Defendant requests plain error review under the closely balanced prong. See *People v. Sebby*, 2017 IL 119445, ¶ 72 (holding that "a clear Rule 431(b) violation is cognizable under the first prong of the plain error doctrine"). Evidence is closely balanced if the case's outcome would have differed absent the impropriety. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 47. "[A] reviewing court must evaluate the totality of the evidence," particularly evidence for the elements of the charged offenses and the credibility of witnesses, and "conduct a qualitative, commonsense assessment of it within the context of the case" when deciding whether the evidence is closely balanced. (Internal quotation marks omitted.) *Id.* We consider not " 'the sufficiency of close evidence but rather the closeness of sufficient evidence.' " *People v. Hudson*, 2023 IL App (1st) 192519, ¶ 58 (quoting *Sebby*, 2017 IL 119445, ¶ 60). If a defendant bears her burden of establishing that the evidence was closely balanced, the error is " 'actually prejudicial.' " *People v. Logan*, 2024 IL 129054, ¶ 71 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)).

¶ 38    Evidence has been held closely balanced where each side presents credible witnesses or a witness's credibility "is countered by evidence that casts doubt on his or her account." *Jackson*, 2019 IL App (1st) 161745, ¶ 48. A credibility contest does not exist where "one party's version of events is unrefuted, implausible, or corroborated by other evidence." *Id.*

¶ 39    Defendant asserts that the evidence was closely balanced because it hinged on a credibility contest between defendant, Joanna, and Mendoza. Defendant contends the witnesses' testimony differed as to who initiated the altercation, whether any of it occurred inside Joanna's apartment, and who used the chair, but she asserts that each version of events was plausible.

¶ 40    Evidence established that Mendoza, defendant, and Joanna had been friends for about 20 years, and Mendoza and Joanna lived in the same building. Defendant testified that she had ended her friendship with Mendoza after Mendoza continued associating with Watkins, despite defendant asking Mendoza not to do so. Watkins had been threatening Joanna, prompting Joanna to park in Mendoza's parking space where Joanna could see her vehicle from her apartment. On the day of the altercation, Mendoza went to Joanna's apartment and requested Joanna move her vehicle from Mendoza's parking space or Mendoza would call a towing company, which led to a physical altercation involving defendant, Joanna, and Mendoza.

¶ 41    Although the witnesses differed as to who was the initial aggressor, a commonsense assessment of the evidence reveals the evidence was not close and this was not a "classic credibility contest." *Cf. Hudson*, 2023 IL App (1st) 192519, ¶ 59. Police photographed defendant, Joanna, and Mendoza after the physical altercation. The photographs show Mendoza's bloodstained face, scratches on her left arm and neck, apparent redness on her back, and bite marks on her right arm and the back of her neck. It can be reasonably inferred by the bite mark on the back of Mendoza's

neck and red splotches on her back that she had been attacked from behind. In contrast, photographs show defendant and Joanna unmarked and their clothing intact after the altercation. Defendant acknowledged hitting Mendoza. Given the scope of Mendoza's injuries and the disparity of her condition compared to that of defendant and Joanna, the evidence that defendant did not act with legal justification in hitting Mendoza was not closely balanced. See *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 79 (photographs of the victim's injuries corroborated her testimony that "she was beaten" and refuted the defendant's testimony that he acted in self-defense); see also *People v. Blair*, 2011 IL App (2d) 070862, ¶ 43 ("the evidence regarding the use of force was not closely balanced" where, among other things, the defendant attacked the unarmed victim from behind).

¶ 42    Defendant requests that we consider the joinder of Joanna's and defendant's trials and the State's misstatements of law during rebuttal when determining whether the evidence was closely balanced as "further context for the difficult decision before the jury." However, "whether the evidence was closely balanced 'depends upon the quantum of evidence presented by the State against the defendant' " (*People v. Moore*, 2020 IL App (1st) 182535, ¶ 22 (quoting *Herron*, 215 Ill. 2d at 193)) and analysis of the evidence for the elements of the charged offense and evidence of witness credibility (*Sebby*, 2017 IL 119445, ¶ 53). Examining those considerations here, the evidence was not closely balanced. While there may have been opposing versions of events as to who struck the other first, the use of a chair, and whether the altercation occurred inside Joanna's apartment, significant evidence, namely Mendoza's injuries and the sisters' lack thereof, refuted defendant's version that she struck Mendoza with legal justification. *Jackson*, 2019 IL App (1st) 161745, ¶ 48 (no credibility contest where a party's account is implausible).

¶ 43    Because the evidence was not closely balanced, "the trial court's failure to comply with Rule 431(b) does not warrant a reversal or remand for a new trial." See *Murry*, 2025 IL App (1st) 221202, ¶ 81.

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 45    Affirmed.