**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180458-U

Order filed September 10, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0458 Circuit No. 16-CF-2662 |
| DETRION M. ANDERSON, | ) ) ) | Honorable David Martin Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justices Schmidt and Wright concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The circuit court did not commit plain error in admitting recorded jail calls at trial. Defendant's robbery convictions were subject to vacatur under the one-act, one-crime rule.

¶ 2     Defendant, Detrion M. Anderson, appeals his convictions for aggravated robbery and three counts of robbery. Defendant argues that (1) the Will County circuit court erred in admitting recorded jail calls at trial because the State failed to lay a proper foundation for the calls, (2) his robbery convictions should be vacated under the one-act, one-crime rule, and (3) the court erred

in imposing extended-term sentences on his robbery convictions. We affirm in part, vacate in part, and remand with directions.

¶ 3                                                    I. BACKGROUND

¶ 4        Defendant was charged with four counts of armed robbery (720 ILCS 5/18-2(a)(1), (a)(2), (b) (West 2016)), one count of aggravated robbery (*id.* § 18-1(b)(1), (c)), and two counts of unlawful use of a weapon by a felon (UUWF) (*id.* § 24-1.1(a), (e)). The State dismissed one count of armed robbery prior to trial.

¶ 5        Defendant filed a motion *in limine* to prohibit the State from introducing his recorded phone conversations that were made from the county jail. Defendant argued that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The court denied the motion. The court ruled jail calls were admissible if a proper foundation was established.

¶ 6        On November 6, 2017, the trial was set to commence. Defense counsel stated that defendant strongly wanted him to file a motion to suppress certain evidence. The court stated that they would not be picking a jury if there was a pending pretrial motion. The court set the matter over until the next morning. The next day, the court reset the case for trial on a later date.

¶ 7        A bench trial commenced on April 16, 2018. A.B. testified that on the night of December 24, 2016, he attended a party with O.D. and Randy Stokes. They left the party in the early morning hours of December 25, 2016. As they were getting into their car, a man with a black Glock in his hands approached them. The man ordered them to lay on the sidewalk, empty their pockets, and take off their shoes. The man stole their shoes and cell phones. A.B., O.D., and Stokes drove to a Wendy's restaurant and met with the police. A.B. said that he could not remember the face of the robber, and he did not give the police any identifying information about the robber.

2

¶ 8        A few days later, A.B. went to the police station. An officer asked him if he knew "Detrion" and showed A.B. a photograph of defendant. A.B. said that defendant was the only "Detrion" he knew. A.B. told the officer that defendant's nickname was TYB. He selected defendant from a photographic lineup. He said that the officer conducting the lineup asked him if he knew who defendant was. He selected defendant as an individual that he knew, not as the person who robbed him.

¶ 9        O.D. testified that he left a party with A.B. and Stokes in the early morning hours of December 25, 2016. Initially, O.D. said that he did not recall anyone approaching them as they were getting in their car. O.D. then acknowledged that he had been robbed at gunpoint. O.D. said that he did not recall what was stolen or whether A.B. or Stokes were with him. Initially, O.D. said that he did not recall going to the police department a few days after he was robbed, but he later stated that he remembered. He acknowledged that he signed a photographic lineup form and that a photograph was selected on the form. However, he did not recall selecting it. O.D. stated that a 911 call was placed from his phone on December 25, 2016, but he did not make the call. The prosecutor played a recording of the call for O.D., and O.D. recognized his voice on the call.

¶ 10        Following the testimony of the 911 operator, a copy of the recording was admitted into evidence and played. In the recording, the caller identified himself as O.D. He stated that he had just been robbed as he was leaving a party. He said that a man at the party came out and pulled a black Glock on him. O.D. told the 911 operator that the suspect's Facebook name was "TYB One Hundred." O.D. said the robber's last name was Anderson. O.D. said the robber had taken their shoes and phones.

¶ 11    Sergeant Tim Powers testified that he met with A.B., O.D., and Stokes at a Wendy's restaurant after the incident. The court permitted Powers to testify for the limited purpose of impeachment that A.B. told him that the robber's Facebook name was "Tyb Ahunnit Anderson."

¶ 12    Officer Mike Matutis testified that he met with O.D., A.B., and Stokes on the morning of the incident, and none of them were wearing shoes.

¶ 13    Officer Eric Zettergren testified that he booked defendant and took several photographs of him. One of the photographs showed that defendant had the letters "T-Y-B" tattooed on his arm.

¶ 14    Detective Brad McKeon testified that he interviewed O.D. at the police department on December 28, 2016. The interview was audio and video recorded. Over defendant's objection, the court allowed the recording to be introduced as substantive evidence of O.D.'s prior inconsistent statement. In the recording, O.D. said that he was leaving a party with A.B. and Stokes when a man with a gun approached them. The man told them to exit the car, remove their shoes, and remove everything from their pockets. The man took these items and left. O.D. did not remove his phone from his pocket, and he was able to call the police after the incident. O.D., A.B., and Stokes met with the police at the Wendy's parking lot after the incident. A.B. knew the robber from Facebook, and they showed an officer a photograph of the robber from Facebook.

¶ 15    McKeon testified that he prepared a photographic lineup on which the fourth photograph was of defendant. Another officer administered the lineup to O.D. After O.D. made his selection, McKeon talked to O.D. about the individual he had identified. That portion of McKeon's interview with O.D. was played in court. In the interview, O.D. said that he had circled the fourth photograph and that "Detrion" was the person in the photograph. O.D. said that this was the person who robbed him.

4

¶ 16       McKeon testified that he met with A.B. at the police department on December 29, 2016. He prepared a photographic lineup for A.B. Defendant's photograph was the second photograph in the lineup. Another detective administered the lineup to A.B. McKeon then spoke with A.B. The interview was audio and video recorded. Over defendant's objection, the court allowed the State to play a portion of the interview as substantive evidence of A.B.'s prior inconsistent statement. In the recording, McKeon asked A.B. if he had selected the second photograph in the lineup, and A.B. said yes. McKeon asked who was pictured in the photograph, and A.B. said "TYB" or "Detrion." A.B. said that this was the person who robbed him.

¶ 17       Shemaree Campbell testified that defendant was her boyfriend. Campbell was served with a subpoena to appear in court on November 6, 2017. She believed she had a phone conversation with defendant after leaving court that day. Defendant asked Campbell to be an alibi witness for him on at least one occasion. Campbell told him she would not do it. Campbell testified as to her phone number.

¶ 18       Jennifer Mau testified that she worked for the sheriff's department. Mau had been trained in how the Securus system worked and as an administrator of the system. The Securus system was an inmate phone system used at the jail. It allowed inmates to make phone calls, and it recorded the phone calls. Mau was able to access the recorded calls and the reports generated by the system. The reports indicated where within the jail the calls were made, the date and time of the call, the phone number that was dialed, and how the call was terminated. Each inmate had a personal identification number (PIN). Mau could search by an inmate's PIN to see what calls the inmate had made.

¶ 19       Mau identified reports generated by the Securus system that showed calls were made from defendant's PIN to the phone number that Campbell had previously testified belonged to her. The

5

calls occurred on October 26, October 29, and November 6, 2017. Mau had recordings of the calls transferred onto a disc. She testified that the calls on the disc were accurate copies of the calls that were recorded by the Securus system.

¶ 20    The State moved to admit the recordings into evidence. Defense counsel objected on the bases of hearsay and lack of a proper foundation. The court overruled the foundation objection. The State indicated that the calls were conversations between defendant and Campbell, and the State was seeking to admit them for defendant's statements. The court ruled that it would only consider the defendant's statements and would disregard any other statements on the recordings. The calls were played in court. All of the calls were made from a male inmate, presumably defendant, to a woman, presumably Campbell. The voices of the male inmate and the woman who answered the call sounded the same in all three calls.

¶ 21    In the first call, which occurred on October 26, 2017, the caller stated that he wanted to come home. The caller stated that he wanted the woman to say two words, and that would get him home. The caller said that the only way that he was getting home without her was if "the motherfuckers don't show up." The caller said they told him that they were not going to show up, but the state's attorney said that they were going to show up.

¶ 22    In the second call, which occurred on October 29, 2017, the caller asked the woman to call his brother and tell him that the caller needed an alibi. The voice of another man could later be heard on the phone. The caller identified himself to the man as "TYB." The man said that the "little black one" told him "they [*sic*] ass wasn't showing up."

¶ 23    In the third call, which occurred on November 6, 2017, the caller and the woman discussed how the woman had been subpoenaed in court earlier that day. The caller said that the State's attorney could tell that she was his girlfriend. The caller told the woman that, if she was asked,

6

she should say that she did not want to provide an alibi for him because she did not want to get involved. The caller said that all the State's attorney had was the woman and "the two dudes [that were] supposed to be telling on [him]." The caller said that one of the two "dudes" was going to say that he did not know the caller and that the caller did not commit the offense. The caller said that the other individual's mother was going to make him say that the caller committed the offense. The caller said that the case would not go to trial the next day because his attorney was going to file a motion.

¶ 24    The court found defendant not guilty of the UUWF charges. The court found defendant not guilty of the three counts of armed robbery, but guilty of three counts of the lesser included offense of robbery. The court also found defendant guilty of aggravated robbery. The court sentenced defendant to concurrent terms of 14 years' imprisonment for aggravated robbery and each of the three counts of robbery.

¶ 25                                    II. ANALYSIS

¶ 26                        A. Admission of Recorded Jail Calls

¶ 27    Defendant argues that the court erred in admitting the recordings of phone calls placed from the county jail because the State failed to lay a proper foundation for their admission under the silent witness theory. Specifically, defendant contends that the State introduced no evidence regarding the capability of the device to record the conversation, the competency of the individual who operated the device, whether the recording device was operating correctly at the time of the call, and the identification of the speakers.

¶ 28    Defendant admits that this issue is forfeited due to his failure to include it in a posttrial motion, but he argues that we may review it under the first prong of the plain error doctrine. Under the first prong of the plain error doctrine, "[a] reviewing court will consider unpreserved error

7

when a clear or obvious error occurs and \*\*\* the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *People v. Jackson*, 2020 IL 124112, ¶ 81.

¶ 29     We first consider whether the court erred in admitting the recorded jail calls. See *People v. Hood*, 2016 IL 118581, ¶ 18 ("In applying the plain error doctrine, it is appropriate to determine first whether error occurred at all."). A foundation for the admission of an audio recording may be established through either (1) the testimony of a witness that the recording accurately represents what he or she personally heard or (2) the silent witness theory. *People v. Dennis*, 2011 IL App (5th) 090346, ¶¶ 22-23. "Under the silent-witness theory, a recording may be admitted without the testimony of an eyewitness if there is sufficient proof of the reliability of the process that produced the recording. *Id.* ¶ 23.

> "Where \*\*\* no party to the conversation testifies to the accuracy of the recording, a sufficient foundation may be laid by evidence as to (1) capability of the device for recording; (2) competency of the operator; (3) proper operation of the device; (4) preservation of the recording with no changes, additions, or deletions; and (5) identification of the speakers." *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001).

"The decision to admit a piece of evidence rests in the sound discretion of the circuit court." *Dennis*, 2011 IL App (5th) 090346, ¶ 27.

¶ 30     We find *People v. Sangster*, 2014 IL App (1st) 113457 to be instructive as to the application of the silent witness theory. In *Sangster*, the State sought to introduce a recorded phone call made by the defendant to an unidentified woman while the defendant was incarcerated in the county jail. *Id.* ¶ 27. At an admissibility hearing, a jail employee testified that calls made by inmates at the

8

county jail were recorded by the jail's telephone system. *Id.* The system had a voice recognition component and each inmate was required to enter his or her PIN and state his or her name before making a call. *Id.* The employee testified that she had listened to the call in question on the jail's system and copied it to a disc. *Id.* The employee said that this was a true and accurate copy of the original recording. *Id.* The employee testified that she had been trained to use the jail telephone system by the supplier of the system. *Id.* ¶ 50. The circuit court held that the recording was relevant and admissible, and it was admitted at trial. *Id.* ¶¶ 28-30.

¶ 31　　　　On appeal, the *Sangster* court held that the circuit court did not abuse its discretion in admitting the recorded jail call under the silent witness theory. *Id.* ¶ 52. The court reasoned that the State presented sufficient proof of the reliability of the process that produced the recording through the testimony of the jail employee. *Id.* ¶ 50. The court noted that the employee testified that she was trained to use the system by its supplier and that the only way the system could be activated was by the caller entering his or her PIN and saying his or her name. *Id.* The court found that the defendant's ability to make the call and its recording was sufficient evidence that the system was working properly. *Id.* The court also noted that the circuit court found that there was sufficient evidence that the defendant made the call based on the caller identifying himself in the call by his nickname, the discussion of the facts of his case in the call, and his attempt to contact known witnesses during the call. *Id.* ¶ 52.

¶ 32　　　　Here, like *Sangster*, the circuit court did not abuse its discretion in admitting the recorded calls under the silent witness theory. As in *Sangster*, we believe that Mau's testimony was sufficient proof of the reliability of the process that produced the recordings. See *id.* ¶ 50. Mau testified that she had been trained as an administrator of the Securus system, which allowed inmates to make phone calls and recorded the calls. Mau explained that she was able to access the

recorded calls. She was also able to access reports indicating where within the jail the call was made, the date and time of the call, the phone number that was dialed, how the call was terminated, and the inmate PIN used to make the call. Mau's testimony established that the Securus system was capable of recording inmate calls. As in *Sangster*, the fact that defendant was able to make the calls and the fact that the calls were recorded show that the system was working properly. See *id.* ¶ 50.

¶ 33 While defendant contends that there was no evidence regarding the competency of the individual who operated the device, it is unclear that this factor applied. That is, it is unclear that the Securus system was operated by an individual when it recorded calls. We note that the *Sangster* court did not explicitly address this factor. See *id.* ¶¶ 46-53. We reiterate that Mau's testimony was sufficient proof of the reliability of the process that produced the recordings. *Supra* ¶ 32.

¶ 34 We also find that there was sufficient evidence identifying defendant as the caller. The calls were made to defendant's girlfriend's phone number using defendant's PIN. Similar to *Sangster*, defendant identified himself by his nickname, TYB, in one of the calls. See *id.* ¶ 52. The voice of the caller sounded the same on all three calls. Also, defendant discussed trial matters in some of the calls. Notably, in the call from November 6, 2017, defendant stated that the case would not be going to trial the next day because his attorney was going to file a motion. The transcript from the hearing on November 6, 2017, showed that this was an accurate reflection of the proceedings in the instant case that day. Because the court ruled that the calls would be admitted only for defendant's statements, we do not believe that it was necessary for the other voices on the call to be identified. The statements of the other individuals were not considered by the court.

10

¶ 35 We reject defendant's argument that the unidentified male voice in the call from October 29, 2017, was presented as "substantive evidence of witness tampering." The court explicitly stated that it would disregard the statements on the calls that were not made by defendant. There was no indication on the record that the court failed to limit its consideration of the phone calls to defendant's statements. See *In re Alexander R.*, 377 Ill. App. 3d 553, 557 (2007) ("Similarly, unless the record reveals otherwise, the trial court is presumed to disregard incompetent evidence.").

¶ 36 Even if we were to accept defendant's argument that the court erred in admitting the calls, we do not believe that the evidence in this case was closely balanced such that the first prong of plain error analysis applied. A.B. testified that a man holding a gun stole shoes and cell phones from him, O.D., and Stokes on the morning of the incident. During O.D.'s interview with McKeon, O.D. gave a substantially similar account of the robbery. On the 911 call, O.D. said that he had been robbed by a man with a gun and that the robber's Facebook name was "TYB One Hundred," and his last name was Anderson. The recordings of A.B.'s and O.D.'s interviews with McKeon showed that A.B. and O.D. each identified defendant as the robber a few days after the incident.

¶ 37 We reject defendant's argument that the evidence was closely balanced because it turned on the credibility of the victims, who recanted their earlier statements to the police. "Evidence is closely balanced when the State and defense witnesses presented two plausible opposing accounts of events and no extrinsic evidence corroborated or contradicted either version, so that the conviction necessarily rested upon a credibility contest." *People v. Moon*, 2020 IL App (1st) 170675, ¶ 50; see also *People v. Sebby*, 2017 IL 119445, ¶¶ 61-63. However, "[n]o 'credibility contest' exists when one party's version of events is unrefuted, implausible, or corroborated by other evidence." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 48.

¶ 38     Here, O.D. did not give opposing accounts of the robbery. He claimed during his trial testimony that he did not remember the details of the robbery, but his 911 call and interview with McKeon showed that he reported that defendant stole his shoes and stole shoes and phones from A.B. and Stokes. A.B.'s testimony that he did not identify the robber to the police or select defendant from a lineup as the robber was rebutted by the video of his interview with McKeon. Moreover, A.B.'s claim during his trial testimony that he did not see the face of the person who robbed him was not plausible in light of his repeated statements to police officers within a few days of the incident that defendant was the robber.

¶ 39                               B. One-Act, One-Crime

¶ 40     Defendant argues that his three convictions for robbery should merge into his conviction for aggravated robbery pursuant to the one-act, one-crime rule. Under the one-act, one-crime rule, a defendant may not be convicted of multiple offenses "carved from the same physical act." *People v. King*, 66 Ill. 2d 551, 566 (1977). "If a defendant is convicted of more than one crime arising out of the same act, the court must reverse all of the 'same act' convictions except the most serious one." *People v. Hagler*, 402 Ill. App. 3d 149, 153 (2010). The State agrees that defendant's robbery convictions should be vacated because they were entered in violation of the one-act, one-crime rule. After reviewing the record and the applicable law, we find that defendant's three robbery convictions derived from the same physical act as his aggravated robbery conviction. Accordingly, we accept the State's confession of error and vacate defendant's convictions for robbery. See *id.*

¶ 41                           C. Extended-Term Sentencing

12

¶ 42    Defendant argues that the court improperly imposed extended-term sentences on his robbery convictions.  Because we have found that these convictions are subject to vacatur under the one-act, one-crime rule, this issue is moot.

¶ 43                                III. CONCLUSION

¶ 44    For the foregoing reasons, defendant's conviction for aggravated robbery is affirmed, and his three robbery convictions are vacated.  We remand the matter to the circuit court to amend the sentencing order to reflect that defendant's robbery convictions have been vacated.

¶ 45    Affirmed in part, vacated in part.

¶ 46    Remanded with directions.