2021 IL App (1st) 210190-U

No. 1-21-0190

Order filed November 16, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 3456 |
| | ) | |
| MARCUS JACKSON, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's dismissal of defendant's postconviction petition is affirmed, where defendant failed to make a substantial showing that his counsel provided ineffective assistance by failing to present the testimony of a witness.

¶ 2   Defendant Marcus Jackson appeals from the second-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, he argues that the circuit court erred in dismissing his postconviction petition, where he

made a substantial showing that his trial counsel was ineffective for failing to call a key witness to testify. We affirm.

¶ 3   Defendant was charged by indictment with two counts of possession of a controlled substance (heroin) with intent to deliver and eight counts of aggravated battery to a peace officer, premised on an October 14, 2013, incident.

¶ 4   Following a jury trial, defendant was found guilty of possession of a controlled substance with intent to deliver and sentenced to 12 years' imprisonment. On direct appeal, we affirmed and ordered correction of the mittimus. *People v. Jackson*, 2019 IL App (1st) 161745. Because we set forth the facts on direct appeal, we recount them here to the extent necessary to resolve the issue raised in this appeal.

¶ 5   Chicago police sergeant John Hamilton testified that on October 14, 2013, he assisted in the search of a residence on the 6800 block of South Bishop Street pursuant to a search warrant. In a bedroom on the first floor, Hamilton found a hidden compartment in the door frame to a doorless closet. Behind a panel on the other side of the wall, the officers found a motorcycle battery, battery charger, and wiring, which opened the compartment. Inside the compartment were two square blocks of an "off white" substance, which appeared to be raw heroin. The blocks were recovered and inventoried.

¶ 6   On cross-examination, Hamilton confirmed that he was the Chicago Police Department's "foremost expert" in "hidden traps." Had Hamilton not seen chipped pieces of wood near the compartment, it would have been "very difficult" to find. Hamilton confirmed he did not see anything that "tied" defendant to the hidden compartment, and the area was not dusted for latent prints in his presence.

¶ 7 Chicago police officer Vincent Ciocci testified that there was a separate warrant for the building's basement, first floor, and second floor, and he was the evidence officer for the basement. While he was in the living room of the first floor, he saw defendant being led upstairs from the basement in handcuffs. Defendant kicked, screamed, attempted to escape, and was brought outside to a transport vehicle because he was acting "belligerently."

¶ 8 Ciocci and other officers went down into the basement. In the kitchen area, they recovered and inventoried two digital scales, one of which had a "white powdery residue" on it. The officers also found money inside a black bag on a coffee table, and they recovered and inventoried a Magic Bullet mixer and two bags of cannabis. Ciocci testified that Magic Bullet mixers are used to mix heroin with a "cutting agent." From a windowsill "[v]ery close" to the scale with heroin residue, the officers recovered and inventoried an item of mail addressed to defendant at the building's address.

¶ 9 On cross-examination, Ciocci testified that he saw the drugs recovered from the first floor. When asked whether Ciocci saw defendant near the evidence on the first floor, Ciocci testified that he only saw defendant being led up to the first floor from the basement.

¶ 10 Chicago police officer Scott Bittner testified that he entered the building through the basement after he was told an individual had opened the door and ran back inside. Bittner saw Federal Bureau of Investigations (FBI) Special Agent Dennaris Coleman and Officer Robert Stegmiller detain defendant in the basement kitchen area. Bittner could not recall any other civilians being in the basement. Defendant yelled, squirmed, and flailed his body. He was handcuffed, led onto the first floor, and placed in a chair, where he continued to yell. Defendant got up and was "taken down" forcefully. Bittner searched the basement and first floor. In the living

room of the first floor, he recovered two pieces of mail from a built-in hutch, which was in a room near where the hidden trap containing heroin was found. The State entered the mail into evidence, and Bittner testified that the two pieces of mail were addressed to defendant at the building's address and sent from ComEd and the Department of Water Management respectively.

¶ 11    On cross-examination, Bittner testified that there were "maybe" one or two other people on the first floor while he executed the search warrant. He first saw defendant on the ground with his hands cuffed behind him. He did not see defendant have any contact with the controlled substance recovered from the first floor.

¶ 12    Chicago police sergeant Michael Karczewski testified that he was watching the front of the building. Defendant exited the basement from the back, made eye contact with him, and ran back through the basement door. Karczewski announced his office and told him to stop multiple times, but defendant did not stop. Coleman and Stegmiller pursued defendant towards the basement, but defendant slammed the basement door on them, and they had to breach the door.

¶ 13    After defendant was placed in the chair on the first floor and before the heroin was recovered, Karczewski told him they had a search warrant for the first floor and basement. Defendant then attempted to escape but was taken down and returned to the chair. Defendant continued to act belligerently as four officers took him to the transport vehicle. The other civilians in the building did not behave as defendant did.

¶ 14    At about 7:26 p.m., Karczewski Mirandized and spoke with defendant at the hospital in the presence of FBI Agent John Rouske. Defendant stated he owned the building that was searched, the building's utilities were in his name, and he used the basement as a music recording studio.

Karczewski asked defendant about his combative behavior, and defendant apologized and said he "just lost it." Defendant also indicated he had flushed about an ounce of cannabis down the toilet.

¶ 15    On cross-examination, Karczewski testified that all the civilians in the building were secured before the premises were searched. A woman in her 30s and an older man were on the first floor. Two men in their 20s, an 81-year-old woman, and a younger woman were on the second floor. Defendant did not make any statements in the hospital about the heroin on the first floor but admitted to possessing cannabis.

¶ 16    Coleman testified consistently with the other witnesses. He added that in the basement, he saw defendant exit the bathroom. He instructed defendant to stop and put his hands above his head. Defendant ran away, and Coleman repeatedly told him to stop. Coleman and Stegmiller performed a take-down on defendant and handcuffed him. Rouske approached and spoke to them, and defendant responded that he "flushed a little bit of weed."

¶ 17    On cross-examination, Coleman testified that he did not know if defendant had any contact with the area where the heroin was found.

¶ 18    Chicago police officer Sean Brandon added that he was the evidence officer for the first floor of the building. Once the first floor was secure, he was told to bring the four second-floor occupants to the first floor. He did not see defendant, but saw four bags of heroin, three of which were in clear knotted plastic bags and one of which was in a black bag. On cross-examination, Brandon confirmed that he did not see defendant contact any of the recovered drugs.

¶ 19    Chicago police officer Robert Gallas added that he and Brandon went to the second floor and detained the four people there.

¶ 20    On cross-examination, Gallas testified that there were multiple indicators that the four people on the second floor resided there. The first floor had indicators that "[s]omebody" lived there, and Gallas "believe[d]" the two people on the first floor had lived there "at some point." He confirmed that he did not see any "ledgers" indicating potential drug transactions, and he did not see defendant possess any controlled substance.

¶ 21    The State stipulated that if called to testify, an Illinois state police forensic chemist would state that she received three knotted bags inventoried together containing a brown chunky powder and one separately inventoried bag containing powder, and tested the contents of the bags. The chemist found that the three bags weighed 594.0 grams, the one separate bag weighed 10.7 grams, and all the bags tested positive for the presence of heroin.

¶ 22    The State further stipulated that if called, another Illinois state police forensic chemist would testify that she tested two separately inventoried bags containing plant material and an inventoried black digital scale with white powdery residue on it. She concluded that one bag of plant material weighed 3.4 grams, the other weighed 0.7 grams, and they both tested positive for the presence of cannabis. She also concluded that the residue of white powder on the scale tested positive for the presence of cocaine and heroin.

¶ 23    In closing argument, defendant's trial counsel asserted that the State had not produced any evidence that defendant had engaged in past drug sales, and the State's witnesses could tell the jury "nothing" about defendant being "involved in drugs." Counsel described the trap containing the heroin as "hidden and hard to find," requiring an expert to uncover. Counsel further argued that while the State's witnesses claimed defendant "mysteriously re-appeared" in the basement where cannabis and a "scant mysterious residue" were found, defendant was not charged with

possessing those items. He further asserted the State showed "no connection" between defendant and the tenants in the building, and there was no showing that defendant had knowledge of the heroin that was recovered. Counsel stated that "not one person, not one witness for the State, took the stand and testified that they witnessed [defendant] ever possess or distribute heroin."

¶ 24    The jury found defendant guilty of possession of a controlled substance with intent to deliver, and acquitted him of all counts of aggravated battery to a peace officer. The trial court sentenced defendant to 12 years' imprisonment.

¶ 25    On direct appeal, defendant asserted that the circuit court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*, the evidence was not sufficient to sustain his conviction, and his mittimus should be corrected to reflect the proper name of the offense for which he was convicted. We affirmed and ordered correction of the mittimus. *Jackson*, 2019 IL App (1st) 161745.

¶ 26    In January 2020, defendant filed a *pro se* postconviction petition under the Act, alleging that trial counsel provided ineffective assistance by failing to call Mario Jackson as a witness.[1] According to defendant, Mario would have corroborated defendant's position at trial that he had no knowledge of or control over the heroin recovered from the first floor, as other people controlled the first-floor premises.

¶ 27    Defendant supported his petition with his own affidavit, averring that in October 2013, he was the owner of the building on the 6800 block of South Bishop, but he did not have "access or control" over the first-floor apartment, which he rented to his "relative" Mario. Defendant averred that he told trial counsel about Mario and that Mario would be willing to testify as to his first-floor

---

[1]Because Mario Jackson has the same last name as defendant, we refer to him by first name.

tenancy, but to the best of defendant's knowledge and belief, trial counsel "did not act on this information in any manner."

¶ 28    Defendant also attached to his petition the affidavit of Mario, who averred that he has lived on the first floor of the building at the 6800 block of South Bishop since 2011, and his girlfriend began living there in 2013. Mario's aunt, cousin, and mother have lived on the second floor of the building since 2011. While no one lived in the apartment's basement, defendant used the basement as a studio and would call Mario to access the basement. Mario claimed that in October 2013, he and his girlfriend were the only people who lived in and had access to the first-floor apartment. He further averred that defendant did not have access to the apartment in October 2013. He claimed that defendant "never went into [his] apartment without permission," and was not in Mario's apartment the day he was arrested. Mario did not see defendant on October 14, 2013, until after defendant was arrested.

¶ 29    The circuit court docketed defendant's petition for second stage postconviction proceedings, and defendant retained counsel. On September 14, 2020, the State filed a motion to dismiss defendant's petition, asserting in relevant part that defendant could not show the performance of trial counsel was unreasonable or prejudiced him, where trial counsel extensively elicited testimony and argued that defendant had no connection with the recovered heroin. According to the State, Mario's testimony only would have weakened the defense theory by suggesting defendant did in fact have a connection to the heroin on the first floor. The jury would have learned from Mario that defendant was related to multiple residents in the building. The State also asserted that defendant could not show that Mario's testimony would have changed the outcome of trial, given the strong circumstantial evidence connecting defendant to the heroin.

¶ 30    At a hearing on the motion to dismiss, defendant's postconviction counsel asserted that defendant owned the building containing the heroin, and he did not live in the first-floor apartment but rather leased the floor to his brother, Mario. The State asserted that defendant's trial counsel clearly made a reasonable decision of trial strategy, choosing to show defendant had no connection with the heroin, rather than showing "someone else may have had better control," which may not have worked because "more than one person can have control." The State added it was not even clear Mario would have testified, as the testimony could have incriminated Mario and thus raised fifth amendment concerns (See U.S. Const., amend. V).

¶ 31    The circuit court granted the State's motion to dismiss the petition. The court recounted the circumstantial evidence linking defendant to the heroin in the apartment, including contraband related to drug dealing in the basement where defendant was, mail on the first floor addressed to defendant, and defendant's ownership of the entire building. The court stated that Mario "would have an absolute and clear Fifth Amendment privilege" if called to testify, and the court recalled defendant's trial counsel "being aggressive and assertive in his advocacy." The court found it "cannot say that [trial counsel] was incompetent in not presenting Mario Jackson with all the infirmities that I see existing here."

¶ 32    On appeal, defendant argues that the circuit court erred in dismissing his postconviction petition, where he made a substantial showing that his trial counsel was ineffective for failing to call Mario as a witness to testify as to defendant's lack of control over the first floor in which the heroin was recovered. The State responds that defendant failed to rebut the presumption that trial counsel chose not to call Mario as a matter of trial strategy, particularly where Mario was defendant's brother and may have linked defendant more closely to the heroin. The State asserts

that had trial counsel called Mario, counsel would not have been able to claim that defendant had no connection to the tenants in the building.

¶ 33    The Act provides a three-stage method for persons under criminal sentence to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Defendant's petition was dismissed at the second stage of proceedings, in which counsel is appointed to represent the defendant if necessary, and the State is permitted to file responsive pleadings. *People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001). At the second stage of postconviction proceedings, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* at 246. "[A]ll well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The second stage of postconviction review tests the legal sufficiency of the petition. *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 34    "The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations," as such determinations are made during the evidentiary third stage of postconviction proceedings. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). "An evidentiary hearing is only required when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 31. In reviewing the second-stage dismissal of a postconviction petition, this court generally reviews *de novo* the circuit court's decision. *Pendleton*, 223 Ill. 2d at 473.

¶ 35    Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), a criminal defendant is guaranteed the right to effective assistance of counsel. *People v. Cole*, 2017 IL 120997, ¶ 22. To prevail on a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must demonstrate both "that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) *People v. Tate*, 2012 IL 112214, ¶ 19. To establish the deficiency prong, a defendant must show that counsel's performance "was so inadequate that counsel was not functioning as the counsel guaranteed by the sixth amendment and, also, must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy." (Internal quotation marks omitted.) *People v. Dupree*, 2018 IL 122307, ¶ 44. Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Id.* To establish prejudice, the defendant must show "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694). Because a defendant must satisfy both prongs of the *Strickland* test, failure to establish either one is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 36    "[T]he decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant," and "such decisions will not ordinarily support a claim of ineffective assistance of counsel." *People v. Peterson*, 2017 IL 120331, ¶ 80. Even a mistake in trial strategy will not alone render representation constitutionally defective unless counsel's trial strategy "is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case." (Internal quotation marks omitted.) *Id.* Defense counsel

need not call a particular witness if he reasonably believes that "under the circumstances the individual's testimony is unreliable or would likely have been harmful to the defendant." *People v. Flores*, 128 Ill. 2d 66, 106 (1989).

¶ 37 We find that defendant failed to make a substantial showing that trial counsel was ineffective for not calling Mario to testify, as he has failed to overcome the presumption that the decision not to call Mario was a decision of sound trial strategy.

¶ 38 Defendant was charged and convicted with possessing heroin with the intent to deliver. At trial, the State presented the testimony of several officers, establishing that the heroin was recovered from the first floor of an apartment building owned by defendant. The heroin was found hidden in an elaborately hidden compartment. Defendant was detained in the basement of the building, struggled, acted belligerently, and attempted to escape arrest. He told police he used the basement as his recording studio. The basement connected to the first floor. The State submitted evidence that mail addressed specifically to defendant at the building was recovered from the basement and first floor, and drug dealing paraphernalia were recovered from the basement, including a scale that had cocaine and heroin residue on it. As we previously found, the paraphernalia "indicates defendant was involved in selling heroin." *Jackson*, 2019 IL App (1st) 161745, ¶¶ 30. As we also found, defendant's ownership in the building, his presence in the basement connecting to the first floor, and the recovery of mail addressed to him on the first floor all showed he constructively possessed the heroin on the first floor, and his attempt to flee indicated consciousness of guilt. *Jackson*, 2019 IL App (1st) 161745, ¶¶ 30, 40-41.

¶ 39 Counsel's trial strategy was essentially to present the theory that defendant had no connection to the first floor where the heroin underlying defendant's charges was recovered. In his

postconviction petition, defendant essentially took issue with that strategy, claiming that he told his trial counsel about the value of his "relative" Mario as a witness, but counsel did not call Mario, whom counsel identified to the circuit court as defendant's brother. According to defendant, the testimony of his brother Mario who lived on the first floor would have shown defendant was not residing on the first floor and could not access it.

¶ 40    However, Mario's affidavit asserted that he and his family rented the first and second floors of the building, and it was undisputed that defendant was related to Mario. Mario's affidavit even stated that defendant would call him to access the basement of the building. Presenting Mario's testimony would have demonstrated defendant's connection to other tenants in the building. Such testimony could have suggested that defendant had a closer connection to the tenants than an ordinary landlord-tenant relationship. This would have undermined the defense theory, and trial counsel could have reasonably believed Mario's testimony would have been harmful to defendant's case. *People v. Ashford*, 121 Ill. 2d 55, 74-75 (1988) (trial counsel's decision to call a particular witness is a matter of trial strategy where the individual's testimony would likely have harmed the defendant).

¶ 41    Moreover, Mario's affidavit asserts that defendant would call him in order to access the building's basement, and he had not seen defendant that day until after he was placed in custody. However, the trial evidence also overwhelmingly showed defendant did have access to the basement, as he had exited and reentered the basement, and neither defendant nor Mario's affidavit offered an explanation as to how defendant accessed the basement that day. Given these apparent discrepancies in Mario's account and Mario's familial relationship with defendant, counsel could have reasonably concluded that the testimony of defendant's family member may have been

unreliable. See *Flores*, 128 Ill. 2d at 106-07 (counsel was not ineffective for not calling members of defendant's family to testify, as counsel could have reasonably concluded their testimony was unreliable).

¶ 42    Finally, as mentioned, even a mistake in trial strategy will not alone render representation constitutionally defective unless counsel's trial strategy is so unsound that he entirely failed to conduct meaningful adversarial testing of the State's case. *Peterson*, 2017 IL 120331, ¶ 80. That is not the case here where the record shows that counsel attempted to distance defendant from the heroin, eliciting through cross-examination testimony from multiple witnesses that defendant was never seen in contact with the heroin and was not seen on the first floor until officers escorted him there. In closing argument, counsel asserted the State failed to present evidence connecting defendant to the heroin on the first floor, or to the other tenants in the building. Given this, defendant has failed to overcome the strong presumption that his counsel's decision not to call defendant's relative Mario as a witness was a product of sound trial strategy. *Dupree*, 2018 IL 122307, ¶ 44. As such, defendant has failed to show that counsel's performance was objectively unreasonable under prevailing professional norms. Defendant's failure to satisfy one of the *Strickland* prongs is fatal to his ineffectiveness claim. *Clendenin*, 238 Ill. 2d at 317-18. Accordingly, the circuit court properly dismissed his postconviction petition.

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 44    Affirmed.