2022 IL App (1st) 190991-U

No. 1-19-0991

Order filed September 12, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 3183 |
| | ) | |
| PRENTICE BROWN, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesil, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for unlawful use of a weapon by a felon affirmed where the evidence established that defendant knowingly possessed firearm ammunition.

¶ 2    Following a bench trial, the trial court found defendant Prentice Brown guilty of unlawful use of a weapon by a felon (UUWF) and possession of cannabis with intent to deliver. It sentenced him to three years' imprisonment. On appeal, defendant contends the State failed to prove beyond a reasonable doubt that he knowingly possessed firearm ammunition. We affirm.

¶ 3      Defendant's conviction stems from the recovery of firearm ammunition from the second-floor apartment of a building located in the 5200 block of West Crystal Avenue in Chicago. Police officers recovered the ammunition while executing a search warrant that named defendant, listed the address of the second-floor apartment of the building, and authorized the seizure of items constituting evidence of the unlawful possession of cannabis.

¶ 4      At trial, Chicago police officer Ernesto Amparan testified that at approximately 10:14 a.m. on February 5, 2018, he was executing a search warrant with a tactical team of officers of the second-floor apartment. As another officer began ramming the front door of the building to gain entry, glass from a second-story window started falling towards the area where the officers were standing. At the time, Amparan was unable to determine why the glass broke.

¶ 5      When the officers reached the door to the second-floor apartment, they announced, "search warrant, Chicago Police," and knocked on the door. An individual, later learned to be defendant's father, opened the door, and the officers entered the residence. The officers identified defendant as the target of their search warrant and detained him. Amparan made an in-court identification of defendant as an individual inside the apartment.

¶ 6      Amparan then learned from the officer monitoring the perimeter of the building that "there w[ere] some narcotics that were thrown outside the window." Amparan went outside to the area where the narcotics were located. In his opinion, the narcotic was cannabis.

¶ 7      Amparan returned to the apartment and continued the search. The apartment had three bedrooms. From what was determined to be the master bedroom, the officers recovered defendant's identification and social security card. They also recovered a statement from the Illinois Department of Human Services (IDHS) dated January 1, 2018, addressed to defendant at

the building and a letter from Transunion dated January 29, 2018, addressed to defendant at the building and attaching a check made out to him. In the same room, the officers also recovered 26 live rounds of Magtech .380-caliber ammunition. The officers further recovered from the bedroom suspect cannabis and narcotics packaging material.

¶ 8    The State published, without objection from defendant, portions of Amparan's body-worn camera video footage for the court, which is included in the record on appeal. The video footage shows, in relevant part, the officers breaching the building, entering the second-floor apartment, and detaining defendant and his father. In one segment, Amparan is seen outside in the gangway taking photographs of plastic baggies on the ground filled with a green-colored substance.

¶ 9    In the video footage showing the search of the bedroom, Amparan is seen in one segment guiding another officer to a drawer of a gray dresser, where the other officer pulls out a plastic bag filled with a green-colored substance and a stack of United States currency. In another segment, Amparan pulls out a small square drawer from what appears to be a jewelry box sitting on top of the gray dresser. In the drawer, he finds multiple social security cards. Other miscellaneous items appear on top of the dresser. In a different segment, Amparan is seen pulling a wallet from the pocket of a pair of jeans. He places the jeans on the bed, where other clothes are seen piled up on the bed. Amparan opens the wallet and cards are seen inserted in the dedicated card slots. Amparan turns the wallet's centerfold, and an identification card is seen in the transparent window slot. Defendant's photograph is visible on the identification card.

¶ 10    On cross-examination, Amparan stated that another officer located the ammunition inside a dresser drawer on the floor of the master bedroom, but he observed the ammunition inside a square-shaped box that he believed had the word "ammunition" on it. No gun was found in the

apartment. Defendant's social security card was found in "a little storage box" on top of the dresser in the master bedroom, along with two other social security cards. The officers recovered defendant's wallet in a pair of blue jeans by the closet door in the master bedroom. Defendant's identification was one way the officers determined the master bedroom belonged to him. The letter from IDHS was either inside or on top of the dresser in an opened envelope in the master bedroom. Amparan could not recall whether women's clothes were found in the bedroom, but there was clothing in the closet and dresser.

¶ 11    Chicago police officer Jesse Oeinck testified that he was executing a search warrant at the building with his partners. Oeinck made an in-court identification of defendant as an individual detained that day. While executing the search warrant, he found .380-caliber live bullets in an ammunition box in a drawer on the floor in the bedroom.

¶ 12    The State published, without objection from defendant, portions of Oeinck's body-worn camera video footage for the court, which is included in the record on appeal. The video footage shows, in relevant part, Oeinck recovering from a zipped pouch two smoking pipes and, from a fabric box, three additional smoking pipes. In a different segment of the video footage, Oeinck is seen standing over a pile of clothes next to a drawer on the floor that is filled with miscellaneous items. Oeinck is holding a blue rectangular box with the word "MAGTECH" in white letters across the top of the box. Oeinck slides the blue box open, and gold ammunition is seen.

¶ 13    On cross-examination, Oeinck stated the box of ammunition was located inside a dresser drawer among clothes and other miscellaneous items. He did not know how long the ammunition was in the drawer or who put it there.

¶ 14    Chicago police officer Mateusz Jasinski testified that he executed the search warrant at the building. When he entered the apartment, he observed an individual already detained. Jasinski made an in-court identification of defendant as that individual. He administered defendant his *Miranda* rights, and defendant stated he was not sure why the officers were at the apartment.

¶ 15    The State also published, without objection from defendant, portions of Jasinski's body-worn camera video footage for the court, which was included in the record on appeal. The video footage shows, in relevant part, Jasinski administering defendant his *Miranda* rights. Defendant replies that he understands his rights. Jasinski then asks defendant if there was anything illegal in the home, and defendant replies "no." In a later segment of the video footage, Jasinski and other officers are seen discussing with defendant and his father how the front window broke.

¶ 16    On cross-examination, Jasinski stated he did not recall whether defendant was shown the recovered box of ammunition.

¶ 17    Chicago police officer Jaime Ortiz testified he assisted the other officers executing the search warrant at the building. Specifically, he was assigned to "stand and watch the perimeter of the building." While doing so, he heard items hit the neighboring building. He looked up at the building that was the subject of the search warrant and observed bags fall from the second-floor window. He could not see who was throwing the bags, which appeared to contain suspect cannabis. Ortiz informed the officers conducting the search warrant about the bags. After the bags outside were recovered and inventoried, he entered the apartment and transported defendant to the police station.

¶ 18    On cross-examination, Ortiz clarified he was not a member of the tactical unit but was assigned to help the officers. He did not inspect any of the rooms in the apartment.

¶ 19    The State introduced and the court entered into evidence a certified copy of defendant's previous felony conviction for robbery (case number 95 CR 34250).

¶ 20    For the defense, Johnny Brown, defendant's father, testified that he owned the "two-flat" building and had lived there for 42 years. Defendant grew up in the building. Brown described the building as having separate apartments on the basement, first, and second floors.

¶ 21    On the day the officers arrived at the building, Brown and defendant were in the second-floor apartment watching television in the front living room when they heard loud, ramming noises at the front door downstairs. Defendant ran to the window overlooking the front door to look out and "burst the window." Brown did not see defendant throw anything out of the window. Brown answered the door when the officers arrived at the apartment.

¶ 22    Brown testified that defendant was not living in the second-floor apartment at the time. Brown allowed his grandchildren, whom he subsequently identified as defendant's children, and their mother to stay there because they were homeless. He did not rent the apartment to them, and they did not live there. By "stay there," Brown meant that they occasionally slept at the apartment. Defendant and the children's mother had been staying there with the children for approximately three or four months before the police came.

¶ 23    Brown indicated he had a valid Firearm Owner Identification (FOID) card on the day the police arrived. Brown stated he left his "stuff all over" the building and stored ammunition in the second-floor apartment. He believed he stored .380-caliber ammunition "in the closet in the drawer" of the second-floor apartment. Brown did not see defendant with a gun or ammunition and did not tell defendant he left ammunition in one of the bedrooms.

¶ 24    On cross-examination, Brown stated his grandchildren, who were defendant's children, and their mother stayed in the second-floor apartment and had some personal belongings in the apartment. Brown did not rent the apartment to them, but "[t]hey didn't have a place to go, so [he was] not going to let them be in the street." Brown testified that defendant "occasionally comes up there." Brown's grandchildren were downstairs in his apartment when Brown heard the loud noises at his front door.

¶ 25    Brown owned a .380-caliber gun, .38-caliber gun, and .22 rifle. Brown stated that had the officers told him about the live ammunition recovered from one of the bedrooms, he would have told them the ammunition was his. He kept bullets everywhere, including upstairs in the second-floor apartment, and defendant "didn't know anything about that." He did not remember where specifically he stored the .380 gun or where he kept the bullets for that gun. He did not keep a gun in the second-floor apartment. Brown did not know defendant could not be around firearms or live ammunition.

¶ 26    The court found defendant guilty of UUWF for possession of the .380 caliber ammunition found in the dresser drawer in the master bedroom and possession of cannabis with intent to deliver. In finding defendant guilty of UUWF, the court explained that Brown was a "biased witness," and it did not believe his testimony that the ammunition was his and defendant did not live there. The court stated that it "didn't sound like the father stayed on the second floor." The court noted that Brown "couldn't even tell us where the gun was," and he "doesn't remember where the gun or the bullets were in the house."

¶ 27    Defendant filed a posttrial motion, arguing the State failed to prove him guilty beyond a reasonable doubt of UUWF, which the court denied. The court sentenced defendant to three years' imprisonment.[1] Defendant timely appealed.

¶ 28    On appeal, defendant argues the State failed to prove him guilty of UUWF because the evidence failed to establish that he knowingly possessed the firearm ammunition.

¶ 29    When a defendant challenges a criminal conviction based on the lack of evidence, the reviewing court must determine whether, considering all evidence in the light most favorable to the prosecution, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact's role is to assess the credibility of witnesses, weigh the evidence, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Moss*, 205 Ill. 2d 139, 164 (2001). The trier of fact need not "disregard inferences that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. We will not retry a defendant, nor set aside a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of a defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 30    To convict defendant of UUWF as charged, the State had to prove beyond a reasonable doubt that the defendant (1) knowingly possessed firearm ammunition and (2) was previously

---

[1] The trial court made no mention of the possession of cannabis charge at sentencing. The order of commitment in the record on appeal shows only a three-year sentence on the UUWF charge.

convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2018). On appeal, defendant argues only that the State failed to prove he knowingly possessed the ammunition.

¶ 31    To prove a defendant "knowingly possessed" ammunition, the State must establish that the defendant actually or constructively possessed the ammunition. *People v. Davis*, 2017 IL App (1st) 142263, ¶ 39. Where, as here, a defendant was not in actual possession of the ammunition, the State must show constructive possession. To establish constructive possession, the State must show that the defendant knew of the ammunition's presence and exercised immediate and exclusive control of the area where it was found. *People v. Wise*, 2021 IL 125392, ¶ 25. Constructive possession is often established entirely by circumstantial evidence. *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 18.

¶ 32    For purposes of constructive possession, a defendant's knowledge may be established by his acts, declarations, or conduct that infers he knew the contraband existed in the place it was found. *People v. Hines*, 2021 IL App (1st) 191378, ¶ 32. A defendant's control may be established by showing his " 'intent and capability to maintain control and dominion' " over an item, even where personal present dominion over it is lacking. *Id.* (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)). An inference of possession is created by a defendant's control over the location where the contraband was found. *Id.*; see *Frieberg*, 147 Ill. 2d at 361 ("Where [contraband is] found on premises under the defendant's control, it may be inferred that he had the requisite knowledge and possession, absent other facts and circumstances which might leave a reasonable doubt as to guilt in the minds of the jury.").

¶ 33    In this case, viewing the evidence in the light most favorable to the State, we find the evidence was sufficient to establish that defendant knowingly possessed the ammunition through

his residence in the second-floor apartment and immediate, exclusive control of the master bedroom. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27 (proving the defendant's habitation in the premises where the contraband was recovered is sufficient evidence of control over the location to establish constructive possession). The evidence showed that defendant was present in the apartment when the officers entered to execute the search warrant, which named him as the subject and listed the apartment number and address of the building. The warrant also directed a search for cannabis and related paraphernalia, which the officers recovered from the apartment.

¶ 34    The evidence also showed that officers recovered the firearm ammunition from a dresser drawer on the floor in the master bedroom. From that same bedroom, the officers recovered defendant's wallet, with his identification, from a pair of jeans near the closet and his social security card. They also recovered two indicia that defendant resided in the apartment, finding two recent pieces of mail addressed to defendant at the building: a January 1, 2018, IDHS statement of defendant's benefits and a January 29, 2018, letter attaching a refund check made out to him. *Terrell*, 2017 IL App (1st) 142726, ¶ 19 ("Evidence of residency or habitation often takes the form of rent receipts, utility bills, or mail."). The natural inference flowing from the presence of defendant's belongings in the bedroom and the proofs of residency was that he exercised control over the entire bedroom and would have known of the ammunition located in the dresser drawer on the floor. See *Hines*, 2021 IL App (1st) 191378, ¶ 36 (the trier of fact need not disregard an inference that flows naturally from the evidence); *Terrell*, 2017 IL App (1st) 142726, ¶ 18 (constructive possession may be shown entirely through circumstantial evidence).

¶ 35    Based on the totality of the evidence connecting defendant to the bedroom, which included not only defendant's presence in the apartment but recovery of his wallet, his sensitive personal documents, and proofs of his residency in the bedroom where the ammunition was found, and construing all reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could reasonably find defendant had the requisite level of control and knowledge to prove constructive possession of the ammunition recovered in the bedroom. See *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17 (establishing defendant's residence in the home is sufficient to show that defendant controlled the area); *People v. Swenson*, 2020 IL 124688, ¶ 35 (all reasonable inferences are viewed in the light most favorable to the State).

¶ 36    Nevertheless, defendant argues that the State failed to prove constructive possession because the evidence was insufficient to show he had "immediate and exclusive" control of the bedroom. In support, defendant relies on *People v. Fernandez*, 2016 IL App (1st) 141667. In *Fernandez*, police officers searched a house and recovered from a bedroom a handgun beneath a mattress, the defendant's insurance cards on a dresser, his passport in a dresser drawer, framed photographs of the defendant and a woman, and men's and women's clothes in the closet. *Id.* ¶¶ 11, 20. The parties stipulated that the defendant received mail at a different address. *Id.* ¶ 14. This court reversed the defendant's UUWF convictions, finding the evidence was insufficient to establish his control over the premises. *Id.* ¶ 21. The court explained there was no evidence of residency or habitation, such as rent receipts, utility bills, or mail, linking the defendant to the home. *Id.* ¶ 19. It also noted there was no evidence placing the defendant in the residence on any date. *Id.* ¶¶ 19, 22. This court concluded that the gun's hidden location and the lack of evidence

that the defendant ever entered the home created a reasonable doubt of his knowledge of the gun's presence. *Id.* ¶ 22.

¶ 37 Here, contraband was recovered from a bedroom of the second-floor apartment. Unlike in *Fernandez*, the officers found defendant inside the second-floor apartment during the execution of the search warrant. Also, unlike *Fernandez*, evidence of defendant's residency or habitation in the bedroom was established through the recent mail addressed to defendant recovered in the bedroom, along with his social security card and wallet containing his identification inside jeans pocket. Therefore, *Fernandez* is clearly distinguishable.

¶ 38 We also reject defendant's argument that constructive possession could not be shown where the ammunition was unlocked and freely accessible to others in the house. The evidence showed that defendant's children and their mother were "staying" in the same apartment where defendant, the proofs of his residency, and his belongings were found. The evidence also showed that Brown owned the building and was present in the apartment. However, Brown's own testimony was that he did not recall where he stored the ammunition for the .380 gun. Moreover, the trial court did not "believe [Brown's] testimony about *** [his] son not living there or that he occasionally stays there." The court also did not believe that the ammunition belonged to Brown. It is not this court's role to substitute our judgment for that of the trial court on credibility determinations or the weight of evidence. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 39 Further, although others arguably had access to the bedroom where the ammunition was found, any indicia of joint access did not negate defendant's constructive possession of the ammunition. See *Jackson*, 2019 IL App (1st) 161745, ¶ 27 (other individual's access to the contraband does not diminish constructive possession); *People v. Maldonado*, 2015 IL App (1st)

131874, ¶ 43 (constructive possession can be established when there is joint possession or others have access to the area). It is also well-established that "the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Cline*, 2022 IL 126383, ¶ 34. Moreover, "[a]ll reasonable inferences are drawn in favor of a finding of guilt." *Swenson*, 2020 IL 124688, ¶ 35.

¶ 40    In sum, the evidence demonstrating defendant's knowing possession of the ammunition was not so "unreasonable, improbable, or unsatisfactory" as to raise a reasonable doubt of defendant's guilt of UUWF.

¶ 41    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.