2023 IL App (1st) 211308-U

No. 1-21-1308

Order filed January 12, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 9718 |
| | ) | |
| KING COLLIER, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

___

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The State presented sufficient evidence to prove beyond a reasonable doubt that defendant constructively possessed a firearm.

¶ 2  Following a bench trial, defendant King Collier was convicted of unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2018)) and possession of a firearm without a Firearm Owner's Identification (FOID) card (430 ILCS 65/2(a)(1), 14(c)(3) (West 2018)) and sentenced to two concurrent terms of two years in prison. On appeal, defendant challenges the

sufficiency of the evidence to convict, arguing that the State failed to prove he constructively possessed the firearm at issue. For the reasons explained below, we affirm.[1]

¶ 3     Defendant's convictions arose from the execution of a search warrant at a single-family Chicago home on April 29, 2019. Following his arrest, defendant was charged by indictment with two counts of possession of a controlled substance (PCS) with intent to deliver, four counts of UUWF, two counts of possession of a firearm without a FOID card, and one count of defacing identification marks of firearms.

¶ 4     At trial, Chicago police officer Joy McClain testified that on the date in question, she was working in the narcotics unit as part of an eight-member team executing a search warrant at the 5900 block of South Laflin Street. Defendant was the named target of the search warrant. As the evidence officer for the team, McClain's duties included taking photographs and recovering and inventorying evidence. At 10:23 p.m., the team of officers arrived at the house, knocked, and announced their office. When no one answered, the officers forced entry.

¶ 5     McClain went straight to the basement, followed by two other officers, Mark Hernandez and Scott McKenna. While descending the stairs, McClain shouted, "Chicago police, search warrant," and heard someone respond, "I'm laying on my stomach, my hands are above my head." As she walked into the basement, she inhaled "a white cloud of powder." Her nose started tingling and burning, she became lightheaded, and she started coughing. Believing the powder could be heroin or cocaine, she called out to the other officers, directing them not to come downstairs so

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

that they would not inhale the powder as well. However, Hernandez and McKenna both experienced the same symptoms McClain did, and McKenna had to go to the hospital.

¶ 6    Defendant, who was the only person in the basement, was lying on the ground "in the middle of the floor." He obeyed McClain's order that he put his hands behind his back and was compliant while she and Hernandez handcuffed him. When the officers lifted defendant off the ground, McClain saw baggies of suspect heroin stuck to his stomach. More baggies of suspect heroin lay on the floor and there was "powder everywhere." The officers walked defendant up to the first floor.

¶ 7    Once McClain was treated on the scene for exposure to the powder and after the air in the basement had "settled," she, Hernandez, and Officer Xavier Chism returned to the basement and conducted a systematic search. They recovered and inventoried baggies of suspect heroin from the floor where defendant had been lying; suspect cannabis, a bag of suspect cocaine, and $96 from a bar countertop; live ammunition from a shoebox on the floor; loose white powder they "scooped up" from the floor; and a book bag containing sandwich bags, Ziploc bags, Dormin, three digital scales, and two mixers. About seven to eight feet from where defendant had been lying, Chism discovered a gap in a wall under a window, in which two bags were hanging. One of the bags contained a .357 Colt with its serial number "graded off" so that it was illegible. The other bag contained "a bunch" of different caliber live rounds, shotgun shell casings, a knotted bag of suspect heroin, and a knotted bag of suspect crack cocaine. McClain recovered and inventoried the Colt and the suspect narcotics.

¶ 8    After searching the basement, McClain searched the first floor. In a bedroom the police identified as the "west bedroom," which contained a king- or queen-sized mattress and a folding

table, McClain's attention was directed to a "beer bucket" on the floor. Inside the bucket was a wallet and a .45-caliber derringer handgun loaded with a .410-caliber shotgun shell. The wallet contained defendant's Illinois State identification (ID) card and Social Security card. McClain recovered and inventoried the derringer. From the west bedroom, McClain also recovered a letter from AAA bearing defendant's name and the address of the residence being searched.

¶ 9 On cross-examination, McClain agreed that when she testified on direct examination as to the inventory numbers of various items she recovered, she was "testifying off of the information that the State's Attorney wrote down on the back of the pictures." After being shown an inventory slip and a "narcotics supp report," she acknowledged that she had testified to incorrect inventory numbers for the powder recovered from one of the bags in the wall and for the loose powder recovered from the floor. She clarified that she recovered and inventoried 27 bags of suspect heroin from the basement floor, which included the bags that had been stuck to defendant's stomach but fell when he stood up.

¶ 10 According to McClain, four or five other civilians were present "[u]pstairs somewhere" in the house at the time of the search. Because she went straight to the basement upon entering the house, she did not know where the other people had been in the house. She did not see any of them in the west bedroom. McClain agreed that, according to her evidence log, the letter from AAA was recovered from inside a shoebox on the floor of the west bedroom. After being shown a photograph of the envelope of the AAA letter, she agreed that it did not have a postmark with a date on it and, therefore, she did not know how long it had been in the house. She also agreed that among the photographs she took were pictures of an ID, a credit card, and a paycheck stub, all with the name Shawn Guice on them, and pictures of two pieces of mail addressed to Roseanne Williams. She

also took photographs of a cell phone on the mattress in the west bedroom, another cell phone in "one of the bedrooms," and two cell phones on the bar in the basement. She did not know who owned any of the cell phones and did not inventory them.

¶ 11    When shown the photograph of defendant's ID, McClain agreed that it listed his address as 5923 South Bishop Street. She inventoried the wallet, but did not take a picture of or inventory defendant's Social Security card. McClain explained that she would have left the Social Security card at the house or with the family. She did not take photographs of or recover any pictures of defendant from inside the residence, did not recover any keys to the residence from him, and did not see him entering or exiting the residence at any time.

¶ 12    On redirect, McClain refreshed her memory with "the supp" and clarified the inventory numbers for various items recovered during the search. She indicated that the ID, credit card, and paycheck stub with the name Shawn Guice on them were recovered from a table in a different bedroom than the west bedroom. She explained that as a matter of course, she does not photograph or recover Social Security cards because "God forbid I lose it or someone steal[s] the identification of the person whose Social Security card it is."

¶ 13    On re-cross, McClain stated that she did not recall where in the house she took photographs of the mail addressed to Roseanne Williams. Other than defendant, she did not know the names of any of the people present in the house at the time of the search.

¶ 14    Chicago police officer Gerold Lee testified that at 10:23 p.m. on the day in question, he and a team of officers arrived at the subject residence to execute a search warrant of which

defendant was a target.[2] Lee knocked on the front door and announced "police search warrant" several times. Receiving no response, the officers forced entry. As Lee made his way through the living room, four people came downstairs from the second floor and out of the "middle" and "east" bedrooms on the first floor. About this time, Lee was "yelled at by other officers to not come downstairs." Defendant was brought upstairs from the basement, and the civilians and officers gathered in the living room.

¶ 15    While in the living room, defendant was wearing a tank top, sweatpants, socks, and flip flops or shower shoes. Officer Angela Pitman asked defendant "what he wanted to wear." Defendant "specifically asked for a jacket and a pair of white Nike tennis shoes that were in the west bedroom." Chism asked defendant about any weapons and/or narcotics. In response, defendant "freely admitted that there was a derringer in a beer bucket in that west bedroom." At some point, Lee saw the derringer, as well as a black wallet, both of which had been recovered from inside a bucket in the west bedroom.

¶ 16    While other officers searched the house, Lee gave defendant *Miranda* warnings on the front porch, after which defendant admitted "knowledge to the drugs being in the basement and admit[ed] knowledge of the gun." Defendant also reiterated that there was a derringer in a beer bucket in the west bedroom.

¶ 17    After defendant was transported to the station, Lee informed him he "was still *Mirandized*" and defendant acknowledged he understood. Lee advised defendant "of the charge," that several

---

[2] When Lee was asked, "Who was the target of the search warrant," he answered, "Mr. King Collier. I think he's the second." Defendant interprets this statement to mean that Lee thought defendant was the second target of the warrant. In contrast, the State, pointing out that defendant's ID lists his name as "King Collier Jr.," interprets Lee's use of the word "second" as a reference to defendant's status as a "Junior."

officers had been "exposed," and that one officer was in the hospital. Defendant agreed to speak with Lee and Chism and "took acknowledgment" of the concealed location behind a wall under the ledge of a block window in the basement where the police had found a .357 revolver, a variety of ammunition, and suspect heroin and cocaine. Defendant asked whether he could apologize to the officer in the hospital and requested that Lee tell that officer it was not his intention to hurt anyone.

¶ 18    On cross-examination, Lee testified that he did not record his conversations with defendant on the porch and at the station. He acknowledged that the supplemental report, which he helped prepare, did not include defendant's verbatim statements. Lee agreed that while defendant said he knew the drugs and gun were behind the wall, he did not expressly say they were his and did not say he placed them there. He also agreed that defendant did not say the gun in the bucket belonged to him. Lee described the west bedroom as unkempt and containing a bed, a dresser, clothing, including female clothing, and "a lot of stuff."

¶ 19    The State entered into evidence certified copies of defendant's conviction for possession of a controlled substance in 2011 and for violating probation in 2013. The parties stipulated that as of April 29, 2019, defendant had not been issued a FOID card or concealed carry license by the Illinois State Police. The parties also stipulated to the testimony of a forensic chemist that some of the items recovered from the house tested positive for cocaine, fentanyl/heroin, and cannabis.

¶ 20    Defendant made a motion for a directed finding, which the trial court denied.

¶ 21    Defendant entered into evidence a certified Illinois Secretary of State identification card application, dated December 12, 2013, listing his residential address as 5923 South Bishop Street.

¶ 22    Following closing arguments, the trial court acquitted defendant of all the drug charges, finding that the testimony regarding inventory numbers was inconsistent for some of the narcotics and that defendant did not admit to possession of the narcotics found in the wall. The court also acquitted defendant of the charges related to the .357 Colt and ammunition recovered from the wall, noting he never admitted to possession, as well as the charge relating to .45-caliber ammunition, as there was no testimony regarding ammunition of that caliber.

¶ 23    The trial court found defendant guilty of count IV, which charged UUWF based on possession of the derringer, and count VII, which charged defendant with violating the FOID statute by possessing the derringer without a FOID card. The court explained that in coming to its determination that defendant constructively possessed the derringer, it had considered defendant's statements that he knew it was in the bucket, that defendant's wallet was "right next to the gun," and "the fact that he goes to that bedroom to get clothing *** when he was getting dressed to leave the residence."

¶ 24    Defendant filed a posttrial motion, arguing, among other things, that the State failed to prove he constructively possessed the derringer. Following a hearing, the trial court denied the motion. In the course of doing so, the court explained it found the State had proved constructive possession beyond a reasonable doubt because the derringer was "in a bucket in a room where he's getting clothing to get dressed. The gun is right next to his wallet, it has identifying information of [defendant]. He also indicates he knew about the gun."

¶ 25    The trial court subsequently sentenced defendant to two concurrent terms of two years in prison.

¶ 26    On appeal, defendant challenges the sufficiency of the evidence to convict, arguing that the State failed to prove beyond a reasonable doubt that he constructively possessed the derringer. Specifically, he maintains the State failed to show he exercised control over the derringer or the area where it was found, and, therefore, failed to prove he constructively possessed it.

¶ 27    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 28    To sustain defendant's convictions for UUWF and possession of a firearm without a FOID card as charged in this case, the State was required to prove beyond a reasonable doubt that he possessed a firearm, had previously been convicted of a felony, and did not possess a FOID card. 720 ILCS 5/24-1.1(a) (West 2018); 430 ILCS 65/2(a)(1), 14(c)(3) (West 2018). Defendant does not dispute the existence of a prior felony conviction or his lack of a FOID card. As such, the relevant inquiry in this case is whether the State proved he possessed a firearm.

¶ 29    Because defendant was not found in actual possession of the firearm in question, the State was required to present evidence that he constructively possessed it. *People v. Walker*, 2020 IL App (1st) 162305, ¶ 20. To establish constructive possession, the State was required to prove that

defendant had knowledge of the presence of the firearm and exercised immediate and exclusive control over the area where it was found. *Id.*

¶ 30    Here, defendant does not challenge the sufficiency of the evidence of his knowledge of the derringer in the west bedroom. He only challenges the element of control. He contends that the evidence of control over the premises was insufficient where he did not have immediate access to the west bedroom; he did not own, rent, or live at the house; his ID listed a different address as his residence; and the undated AAA letter was "junk mail" with little or no evidentiary value.

¶ 31    In the context of constructive possession, control is established by showing the defendant's intent and capability to exercise dominion over the contraband. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. The fact that others also have access to the area where contraband was found does not diminish the defendant's constructive possession. *Id.* Habitation in the premises where contraband is discovered is sufficient evidence of control to constitute constructive possession. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Proof of residency, which can take the form of rent receipts, utility bills, and clothing in closets, is relevant to show habitation and, therefore, control. *Id.* When deciding whether constructive possession has been shown, the trier of fact is entitled to rely on reasonable inferences of knowledge and possession. *Id.* Constructive possession is typically proved entirely through circumstantial evidence. *People v. Smith*, 2015 IL App (1st) 132176, ¶ 26.

¶ 32    Viewing the evidence in this case in the light most favorable to the State, as we must, we find that there was sufficient evidence of defendant's control over the area where the derringer was found to establish constructive possession. First, it cannot be ignored that defendant was present in the house at the time of the search. Second, defendant's wallet, containing his ID and Social

Security card, was found alongside the derringer in the bucket. Third, defendant kept clothing in the room where the derringer was found. When the police asked defendant what he wanted to wear to leave the house, he "specifically asked for a jacket and a pair of white Nike tennis shoes that were in the west bedroom." Finally, the police found a letter from AAA in the west bedroom, which was addressed to defendant at the house's address. While defendant is correct that "junk mail" has little evidentiary value given the nature of mass mailing solicitations (see *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 28), we agree with the State that in this case, the AAA letter cannot be dismissed so easily. A photograph of defendant's open wallet, which was introduced into evidence at trial, depicts a AAA membership card inside. As such, we agree with the State that the presence of the letter in the west bedroom supports a finding of control.

¶ 33    Defendant's presence in the house during the search, coupled with the presence of several of his personal items in the west bedroom—his clothing, a letter, and, significantly, his wallet containing his ID and Social Security card in the same container as the derringer—support the trial court's conclusion that he controlled the area where the weapon was found. See *People v. McLaurin*, 2021 IL App (1st) 192203-U, ¶¶ 26-27 (finding control of bedroom based on presence of utility bill in defendant's name at that address, birth certificate, and family photograph); see also Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential Appellate Court orders entered on or after January 1, 2021, may be cited for persuasive purposes). The evidence was sufficient to establish control and, in turn, constructive possession beyond a reasonable doubt.

¶ 34    Defendant nevertheless argues the evidence of his control over the derringer itself was insufficient where "other than the fact that a few of [his] personal items were in the west bedroom, nothing indicated that he was anything more than a visitor at the location or that he exercised

control over any of the items in that bedroom beyond a few personal belongings." In making this argument, he asserts that Lee's testimony regarding his statement asking for clothing "was found to have limited weight by the court."[3] He notes that other people were present in the house, and asserts that, after the police entered the premises, people came out of the bedrooms on the first floor, "which included the west bedroom."[4] In support of his argument for a finding of lack of control, defendant also highlights that mail and documents bearing others' names were found in the house, that women's clothing was observed in the west bedroom, and that a cell phone on the bed in the west bedroom was not inventoried.

¶ 35    The various circumstances defendant claims argue against a finding of control do not change our conclusion. Although, at the time of his arrest, defendant was not in the same room as the derringer, a defendant need not have immediate access to a location to be found to have constructive possession of contraband within it. See, *e.g.*, *Jackson*, 2019 IL App (1st) 161745, ¶ 30 (constructive possession found where defendant was in basement apartment that had indoor access to first-floor apartment in which contraband was recovered); *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 40 (constructive possession found where defendant was in first-floor unit and contraband was recovered from attic accessible from enclosed back porch).

¶ 36    The fact that defendant's ID listed an address other than the house as his residence is not dispositive, as "[t]here is no requirement that [items of contraband] be found in defendant's residence as proof of his exclusive and immediate control over them." *People v. Hines*, 2021 IL

---

[3] The record reveals that the trial court indicated it was giving "limited weight" to Officer Lee's testimony that defendant admitted knowledge of the contraband in the basement. The trial court did not say it was giving limited weight to any other portions of Lee's testimony.

[4] Defendant is correct that the first floor "included the west bedroom." However, at trial, Officer Lee testified that "people came out from the middle and east bedrooms."

App (1st) 191378, ¶ 34. Finally, we are mindful that documents bearing other people's names were found in the house and that women's clothing was observed in the west bedroom. However, even if others had access to the west bedroom, it would not exonerate defendant, but, rather, would make his possession of the firearm joint. *People v. Ingram*, 389 Ill. App. 3d 897, 901 (2009). Constructive possession is not diminished by evidence of others' access to contraband. *People v. Givens*, 237 Ill. 2d 311, 338 (2010).

¶ 37     The trier of fact is not required to disregard inferences that flow normally from the evidence, nor seek all possible explanations consistent with innocence and elevate them to reasonable doubt, and the State need not disprove or rule out all possible factual scenarios in order to sustain its burden. *People v. Newton*, 2018 IL 122958, ¶¶ 24, 27. Taking the evidence in the light most favorable to the State, as we must, we find that a reasonable trier of fact could find that defendant had constructive possession of the derringer. Accordingly, defendant's challenge to the sufficiency of the evidence fails.

¶ 38     For the reasons explained above, we affirm the judgment of the circuit court.

¶ 39     Affirmed.